Filed 10/16/17

<u>CERTIFIED FOR PARTIAL PUBLICATION</u>[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>BRITTANY NAVARRA,<br><br>    Defendant and Appellant. | F071142<br><br>(Super. Ct. No. MCR030669A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Madera County, transferred for trial to Superior Court of Stanislaus County (case No. 1429372). Marie Sovey Silveira and James E. Oakley, Judges.

Audrey R. Chavez, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Lewis A. Martinez, Tia Coronado and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]    Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, only the Introduction, part VI of the Discussion, and the Disposition are certified for publication.

## INTRODUCTION

Brittany Navarra (defendant) stands convicted, following a jury trial, of first degree murder (Pen. Code, § 187, subd. (a); count 1), first degree burglary (*id*., § 459; count 2), and conspiracy to commit murder (*id*., § 182, subd. (a)(1); count 3). The jury further found true a lying-in-wait special circumstance (*id*., § 190.2, subd. (a)(15)) with respect to count 1. Defendant was sentenced to life in prison without the possibility of parole (LWOP) and ordered to pay various fees, fines, and assessments.[1]

In our original unpublished opinion, we found no prejudicial error and affirmed, rejecting defendant's claims (1) she was denied various constitutional rights by the admission of Gran's convictions; (2) she was denied various constitutional rights by the admission of Gran's statement to a psychologist who interviewed Gran in conjunction with Gran's plea of not guilty by reason of insanity (NGI); (3) the jury instructions allowed jurors to find defendant guilty of first degree murder based on Gran's mental state rather than her own; (4) there was insufficient evidence to support first degree murder by lying in wait and the lying-in-wait special circumstance; (5) imposition of an LWOP sentence violated the Eighth Amendment to the United States Constitution.

Defendant petitioned for rehearing, arguing, among other things, that Proposition 57, the Public Safety and Rehabilitation Act of 2016 (Proposition 57 or the Act), requires that she be afforded a conditional reversal of the judgment and remand for a fitness/transfer hearing in juvenile court.[2] Although it would have been preferable for appellate counsel to seek permission to file a supplemental brief before defendant's appeal was ordered on calendar, rather than waiting until our opinion was filed, we granted rehearing to determine whether defendant is entitled to relief under

---

[1]    Defendant initially was jointly charged with Dustin Robert Gran; however, the parties stipulated to sever the cases for trial. Defendant and Gran were tried separately, with venue changed for both trials to Stanislaus County, where a new case number was assigned in accord with that county's case management system. Gran's case is not before us on this appeal.

[2]    Unless otherwise specified, references to this enactment are to those portions of the Act applicable only to juvenile offenders.

Proposition 57.  In the published portion of this opinion, we conclude Proposition 57 does not apply retroactively to defendant's case.  In so holding, we reject defendant's claim retroactivity to juvenile offenders with LWOP sentences is required under *Montgomery v. Louisiana* (2016) 577 U.S. ___, ___ [136 S.Ct. 718, 734] (*Montgomery*).  In the unpublished portion, we adhere to our original analysis and again find no prejudicial error.  Accordingly, we again affirm.

## FACTS[*]

### I

### PROSECUTION EVIDENCE

As of January 14, 2008, Thomas Hollier resided on Winter Way, in Madera.  Also living in the house were Krista Pike, Thomas's fiancée, and Lynn Hollier, his father.[3]  Thomas and Pike had known each other for about four years.  They had dated for about two years, then Pike and her family moved away and the couple broke up.  When Pike returned to Madera in December 2007, they "picked up right were [they] left off" and started talking about marriage.  Pike moved into the Hollier residence around January 1.

At the time Pike returned to Madera, Thomas had been dating defendant for two weeks to a month.  Thomas broke up with defendant the day after Pike returned.  He told defendant that he was breaking up with her because the person he actually loved came back.  Defendant was emotional and crying.

The next time Thomas saw her, defendant and Gran, who were dating, were at a birthday party at Samuel Browning's house.  Thomas and Pike also went to the party, which took place on December 14, 2007.[4]  Defendant subsequently came over to

---

[*]     See footnote, *ante*, page 1.

[3]     Unspecified dates in the statement of facts are to the year 2008.

For clarity, Thomas Hollier and Lynn Hollier are referred to by their first names.  No disrespect is intended.

[4]     Thomas knew Gran from school.  Gran once said he killed two girls.  Thomas did not believe him.  In addition, Gran was friends with Browning.  Browning was part of a group who came to Thomas's house almost every day to play video games.  At Thomas's invitation, Gran

Thomas's house a week or two before January 14, because she wanted to take Pike to shop for a wedding dress. Veronica Blumberg was with defendant.[5] Thomas had known Blumberg for a couple of years. He had met her through Pike, with whom she was friends. When defendant, Blumberg, and Pike returned to the house after going to the mall, they all were laughing and seemed to be getting along. Thomas did not notice any tension between defendant and Pike. After Thomas and defendant broke up, Lynn told Pike that if Pike wanted, he would tell defendant to quit coming over to the house. Pike said things were fine and they were friends. She said they were "past it" and defendant was dating Gran now.

According to Blumberg, however, defendant took the breakup with Thomas "hard." Defendant was angry at Thomas and Pike, and she was frustrated and sad. She never got over or accepted the breakup. Defendant wanted Pike "out of the picture." At first, this meant she wanted Pike to go back to where she had been. After defendant met Gran, however, defendant wanted Pike dead. Defendant told Blumberg so in December 2007, sometime before Christmas.

At the time of the conversation, Gran, defendant, and Blumberg were at Gran's house, watching a movie in which the main character was an assassin who had an apprentice. Gran said his third job was being an assassin, and he asked Blumberg if she wanted to be his assistant. They joked around a bit, and Blumberg did not really give an

---

joined in this activity perhaps once or twice a week starting around December 2007. None of these people had a key to Thomas's house. The Holliers had four dogs. They were friendly and got along with everybody. They did not bark at Gran.

[5] Blumberg testified under a grant of use immunity. She and defendant became friends through school sometime before the summer of 2007. Blumberg and defendant met Gran in December 2007, at Browning's party. From her observations of Gran and defendant, Blumberg did not get the impression that either was the follower or the leader in the relationship.

Gran's father first met defendant the third week of December 2007, and she spent part of Christmas with the family. That day, Gran's father made an offhand comment about wishing Gran would clean his room. Two days later, defendant led Gran to clean his room.

4.

answer.[6] Gran said Blumberg's first job would be Pike, and asked how Blumberg would kill her. Blumberg said she would draw Pike out of the house and have her get in Blumberg's pickup, and Gran would be in the back and would strangle Pike. Blumberg also suggested making it look like a suicide. Blumberg had no animosity toward Pike and did not want her dead, and made the suggestion just to say something. Sometime later, Blumberg was taking defendant to school, and defendant said Gran had ask defendant to ask Blumberg if Blumberg still wanted to be his apprentice to kill Pike. Blumberg said no. Despite this, defendant continued to talk about different ways to do it. Blumberg changed the subject and again said she did not want to be involved. Blumberg knew, from what defendant told her, that defendant and Gran had a plan to kill Pike. Gran was supposed to do the killing. In return, defendant was to give him sex. Defendant said Pike's murder was supposed to be her (defendant's) Christmas gift. Defendant said the purpose of killing Pike was so defendant could get back with Thomas, whom defendant still loved. The purpose of the trip to the mall was so defendant could gain Pike's trust in order to be able to visit the house.

A week before January 14, Lynn was sick and stayed home from work. At some point, he heard Pike talking to someone. Later that day, Pike said Gran had come over to retrieve his keys or guard card (Lynn could not remember which) and then stayed for a while. Thomas was at school at the time. Defendant told Blumberg that Gran had gone over to the house to play video games, but he could not do anything because the household was home sick.

On the morning of January 14, Thomas, who was a senior at Madera High School, left the house around 6:00 a.m., as he had an early weight-lifting class. Pike, who had her own room, was still asleep. Lynn had to be to work at 7:00 a.m. Pike was still at the house when he left. When he stopped by the house around 9:30 or 10:00 a.m. to pick up a movie a coworker wanted to borrow, Pike was on the couch, watching television.

---

[6]     Defendant may have been asleep during this time.

Thomas and Pike exchanged text messages during Thomas's lunch period. Pike was looking for a book in which she had a recipe for the dinner she was supposed to make that night. Thomas last received a text message from Pike midway through his lunch period, sometime around the noon hour. He texted her throughout lunch, but she did not reply.[7] He thought she might be with her father.

During lunch hour, Blumberg saw defendant texting on defendant's cell phone. Blumberg could not see the content of the texts, but asked whom defendant was texting. Defendant responded that she was texting Gran.[8] She said he was over at Thomas and Pike's house. Defendant related that Gran could not strangle Pike because Pike kept touching her chin, and he asked what he should do. Defendant said she told him just to rape her, kill her, and get it over with. Defendant seemed agitated, annoyed, frustrated, and a bit angry.

After school, Blumberg dropped defendant off at Game Tyme, then went home. On the drive to Game Tyme, defendant said it was done. Blumberg understood this to mean Pike had been killed.

Thomas got out of school around 2:30 or 3:00 p.m., and it took him 10 or 15 minutes to get home. He walked inside and saw Pike lying on the ground. He threw his backpack, ran over near her, and then tried to focus to find a phone to call someone. He found a telephone handset and pushed the call button, and happened to call his sister. Thomas did not touch Pike, but remembered falling down beside her and being dragged away by his father.

Meanwhile, Lynn was at work when he received a telephone call from his daughter. She was hysterical. She said someone had killed Pike, and Lynn needed to get

---

[7]     Telephone company records showed the last outgoing activity on Pike's cell phone was a text message sent at 12:46 p.m. on January 14.

[8]     Samantha Powell reported she saw defendant texting during the first 10 minutes of lunch, which started at 12:13 p.m. When Powell asked whom she was texting, defendant responded that she was texting Gran. Powell walked away and defendant continued to text.

to the house because Thomas was there by himself.**9**  When Lynn arrived home, he could hear Thomas making an indescribable sound.  Lynn rushed into the house and found Thomas lying beside Pike's body.  Pike was clearly dead.  Thomas did not want to leave her, so Lynn dragged him down the hall.  The only thing Thomas said was, "Why?"

At approximately 2:40 p.m. on January 14, Madera Police Officer Dilbeck was dispatched to the Hollier residence.  As he and Officer Spears arrived almost simultaneously, Lynn was walking out of the residence.  Lynn told Spears, whom he knew, " 'Bill, they cut her throat.' "  Inside, Thomas was in a fetal position in the hallway, crying uncontrollably.**10**  Dilbeck discovered Pike lying in the living room, with her feet toward the sliding glass door and her head toward a couch.  A blue comforter was strewn across the middle cushion of the couch and onto the carpet.  A notebook, binder bearing Pike's name, and a shopping list with blood droplets were on top of the comforter, and what appeared to be blood was at the end of the comforter farthest away from the couch.  There was a lot of blood on the arm of the couch and the cushion nearest that arm.  It was still sticky.  There was a black shirt on the arm of the couch and some items on the floor by the couch.  Pike was naked from the waist down.  She had a deep laceration to her right thigh and another long, deep laceration across her abdomen, neither of which showed free-flowing blood.  She also had her throat cut.  There was a lot of blood in this area.  It appeared to be dry.  Her shirt had been opened and her bra had been cut, and bloody pants, with ripped panties partially inside, were covering part of her face.

---

**9**    After calling Lynn, Lynn's daughter called 911.

**10**    Thomas recalled the police taking him outside.  He remained in his car for a period of time, then was taken to the hospital for medication to calm him down.  He may have talked to Browning that night, but he never told Browning or anyone else anything about the circumstances of Pike's death.

Detective Garibay, the lead detective in the case, saw Thomas using his cell phone while Thomas was in the car.  In the middle of texting or calling, Thomas would break down and cry.  Thomas remained too distraught to talk to Garibay much, so Garibay interviewed him at the hospital.  When Garibay asked about the calling and texting, Thomas said he had been letting his friends know what happened.

Her head was bloody. She clearly was dead. The pools and other areas of blood were such that it appeared she was on the couch and moved to the floor, and then moved to a different spot on the floor.[11]

There was no one else in the house and no signs of forced entry.[12] Pike had written on the mirror in the bathroom, " 'Thomas, hey, baby! I hope school was okay today. Dustin came over earlier. He lost his work keys. I know my mom is being a bitch, but me and you will be just fine. Daddy will help us no matter what. I love you, babe, write back soon.' "[13] A few feet from the body were square-shaped blood patterns in the carpet. Spears noticed a stack of dumbbells in the kitchen. They were angular rather than circular. One of the smallest pair, which were five pounds each, was missing. The remaining member of the pair appeared to match the bloody squares. It did not have any blood on it. Pike's cell phone was also missing. Neither it nor the missing five-pound dumbbell was ever found.

Dilbeck maintained the crime scene log for several hours that day, meaning he stood in the street, keeping civilians and nonessential personnel out of the crime scene and making note of everyone who entered. During the time Dilbeck was in charge of the crime scene log, which was from approximately 4:17 p.m. to 7:00 p.m., he spoke to

---

**11** A rape kit was performed on Pike's body. DNA profiles from the vaginal swabs were consistent with Pike's own DNA profile. Thomas, Gran, and defendant were excluded. With respect to DNA obtained from Pike's underwear, neither she nor Thomas could be eliminated, while Gran and defendant were eliminated as contributors. A used condom was found in the trash in the hallway bathroom. DNA profiles obtained from it were consistent with Pike and Thomas, while Gran and defendant were eliminated as contributors. A used condom was also found in a trash receptacle outside the residence, but inside the property fence. DNA profiles obtained from it showed Thomas, Pike, Gran, and Navarra all were eliminated as contributors, as was Browning.

**12** The door leading from the kitchen to the garage had a doggie door through which a grown man could fit. It could be fastened shut with a slide mechanism, but, according to Thomas, the slide could easily be kicked off. After the homicide, Lynn noticed that one of the dogs had a contusion on the side of its face like it had been kicked or hit.

**13** Pike and Thomas habitually left notes for each other on the mirror.

Browning, who was one of the people gathered around Pike's father.[14] Dilbeck did not inform Browning about Pike's injuries, but it was possible Browning heard Dilbeck briefing other law enforcement personnel in that regard. Browning said he might have information about someone who had made threats against Pike. He was interviewed later that day by detectives. Dilbeck considered him a suspect.

Detective Bushey interviewed defendant at the police department on the evening of January 14. She was not considered a suspect at the time.

During the interview, defendant described Pike as being a very close friend. She explained that Pike had moved away and recently returned. Defendant said that Thomas, who was Pike's fiancé and with whom Pike lived, was an ex-boyfriend of defendant. Defendant explained that Thomas broke up with her (defendant) to join the Navy. Thomas was enlisting for five years, but defendant was going in for 20 years, and so things did not work out particularly well.

Defendant related that she last spoke to Pike the night before. She and Gran went over to Pike's house to watch a movie, then left around 7:30 p.m. Defendant did not want to wake Pike and so did not text her until sixth period on January 14—which was around 2:00 p.m.—but did not get an answer. Defendant had been texting her since. After school, which let out at 3:15 p.m., Blumberg dropped her off at Game Tyme, where she met up with Gran, and they then went to Gran's house. This was about 3:45 p.m.

Defendant stated that all she heard was that Pike had been killed. She did not know where or why her "best friend" was killed. She learned of the death when detectives showed up at Gran's door and said they wanted to investigate defendant and Gran. Defendant stated she did not know why anyone would want to hurt Pike. She told

---

**14** It was still light out when they spoke. According to Lynn, Browning was one of Thomas's friends who began showing up at the house. His mother brought him over. Browning, who seemed to have a sense of urgency, said he had some information. Because Browning had a reputation for telling tall tales about things he saw and did, Lynn told him that he had better not be lying, then took him over to one of the officers.

Bushey that she did not think Gran worked that day, but she did not text him while she was at school, so she did not know what he did before they met up at Game Tyme.

During the interview, Bushey commented that defendant did not seem too broken up for someone who had just lost her best friend. Defendant explained that she had been hurt so much in her life, by losing a lot of family members and her mother dying of cancer, that she had become able to hold it all in. Her doctor said "schizophrenic." She just did not show emotion.

Defendant said her mother kept calling her, and Bushey told defendant to go ahead and talk to her.[15] Defendant said she was at the police department, and that someone had broken into the house of one of defendant's really close friends and killed her. Defendant then took a second call, in which she said she did not know what happened and had only heard Pike was killed. Apparently informed by the caller that the perpetrator raped Pike, Defendant responded, "Oh, my God. I was actually getting really close to her too." She subsequently said, "Um, because I'm his ex-girlfriend, all eyes are put on me." She stated she was worried about Thomas, because the first time Pike left him, he almost committed suicide. Defendant said she was stuck at the police station and did not know where Thomas was. She said she did not want to go over there and then get blamed for everything. Defendant subsequently left a message for Thomas in which she expressed her sorrow over Pike's death, as well as hope Thomas was doing okay and would not do anything stupid.

Bushey returned, accompanied by Garibay. Defendant asked them what exactly happened to Pike. Told they could not go into a lot of detail, but that the killing was "kind of up close and personal," defendant asked, "Like, in a rape?" Bushey found this unusual, since he had not told defendant anything about the details of the case and did not even know himself.

---

[15] Bushey left the room at this point, but the recording continued.

Dilbeck subsequently viewed video surveillance from Game Tyme. Video from the morning of January 14 showed Gran—the "Dustin" mentioned in the writing on the mirror—leaving. He returned to Game Tyme, then left through the business's back door at 12:27 p.m. On his way out, he looked at the surveillance camera with a weird look on his face.[16] He was gone around the time Pike was killed, then returned at 1:50 p.m. When he returned, it appeared he had changed his shoes, although he may have been wearing the same shirt. He went straight into the bathroom. The video showed that while he was in the bathroom, Game Tyme employee Jaime Richards was talking to someone who was outside the business. Richards could not recall if it was Browning, although it could have been. Richards was not sure if the person was with Gran.

On January 15, police learned Bethany Cochran, a student at the high school, had gone to security and advised that she had information regarding the incident. When interviewed, Cochran related that after Pike was discovered, Blumberg said something about there being a plan to kill Pike. Blumberg was then contacted and was brought to the police department by her mother for an interview. During the interview, it became apparent Blumberg had participated in some conversations about if and how Pike was going to be killed. Blumberg ultimately described the backstory, then explained defendant wanted Pike killed, and there was a plan about which defendant and Gran had spoken. Blumberg admitting making some suggestions as to how Pike could be killed.[17] She said she was not involved, but she knew, on January 13, that Gran was planning on going to the Hollier house on January 14. Gran and defendant had been talking about killing Pike since Pike returned to Madera. Blumberg also said defendant had told her that Gran killed Pike, and that defendant had told him to rape her and kill her and get it over with.

---

**16** The security footage for January 14 was later erased and its content had to be recovered. So far as Dilbeck knew, the footage from that day was the only video that was erased.

**17** The actual recording of the interview was played as part of the defense case.

Blumberg's statements caused Garibay to focus his investigation on Gran and defendant. He believed Blumberg was a part of what happened, and he pressed her concerning her participation. Based on her responses that she did not think it was going to happen and did not want to do it, he decided to have her make a pretext phone call, since he did not have any independent evidence that Gran was the killer or to support defendant's arrest.

The initial pretext call was made to Gran. There was no answer. Garibay then had Blumberg call defendant. Eventually, contact was made. Blumberg told defendant that Blumberg's father had said the police wanted to talk to Blumberg. She asked what defendant told them, so she could go along with it.[18] Defendant responded that she said she had seen Pike on Saturday, and that was the last time she saw her. She told the truth about dating Thomas, and said there was a little fight when Pike threatened her, but they got along in the end. Blumberg then asked what really happened. Defendant said "[h]e slit her throat and trauma to the head."

Detectives had Blumberg call defendant a second time. During this call, defendant acknowledged she was scared, because she was one of the main suspects. She pointed out that she and Blumberg were at school at the time of the killing, though. She stated she was not allowed to talk to Gran, because Gran's lawyer did not want him to talk to or see anyone. When Blumberg asked why "we" started this in the first place and got Pike killed, defendant said she did not remember, and now she was thinking it was a bad idea.

Blumberg said she remembered defendant saying something about Gran hitting Pike on the head, and she asked what he used. Defendant said Gran did not tell her, because he thought it would be best if she knew as little as possible. Defendant acknowledged asking Gran to do it during Christmastime, but said she guessed she did not really think he would. Defendant also acknowledged she felt an overwhelming sense of rage when Thomas broke up with her, but now she could not believe they did this.

---

**18** The actual recording of the calls was played as part of the defense case.

Defendant said she prayed this did not "come and get us," because "we're gonna be screwed up bad. Me and Dustin the most."

Gran was arrested at his home on the evening of January 15. His cell phone was seized.

Defendant was also arrested on the evening of January 15. Garibay and Detective Herspring interviewed defendant following her arrest and after advising her of her rights. Defendant, who gave her age as 16, related that she and Pike were good friends during their freshman year. After Pike moved away and returned, however, the two "fought a little bit," because Pike got back together with Thomas, whom she knew defendant liked and would date sometimes. Pike kicked defendant out of the house once or twice because defendant was flirting with Thomas. Defendant said she (defendant) and Thomas were engaged for a month. She still really loved him.

Defendant explained that Pike returned around December 10 or 15, 2007. Defendant was dating Thomas at the time, but they broke up about four days after Pike's return because Thomas was still in love with Pike and "it made a complication." Defendant never thought Pike would come back. The breakup made defendant "a little mad," because she could not figure out why Thomas would leave her, but she got over it after a while.

Asked if she had any arguments or confrontations with Pike, defendant responded that she was told there was an argument on Saturday night, but she blacked out and did not remember anything about it. She remembered going somewhere and then walking out of the car, then she just passed out. She had not been drinking; it was just "a thing" she had in which, because she had so much drama in her past, if she got too stressed she would pass out and forget the day. This happened perhaps once a year. Pike texted defendant and suggested they go to the mall, however, and they worked out their problems. The trip to the mall, which also involved Blumberg, took place on Saturday.

13.

Defendant related that she met Gran through Thomas about the time she and Thomas broke up. Defendant and Gran were now boyfriend and girlfriend, although the relationship was "up and down." Defendant explained that she had been finding out some things about Gran's past, and some things he had done were disturbing. For instance, about four or five days earlier, he had told her that he was forced to rape some children when he was 13. He also said his third job was as a hit man, and he killed people about a year ago. Defendant said she was kind of scared to be around him. They treated each other well, however. Defendant liked Gran, but she loved Thomas.

Defendant related that on January 14, she woke up and took the bus to school. She got out at 3:15 p.m., and Blumberg dropped her off at Game Tyme, where Gran was. Defendant then went straight to Gran's house. She had been on campus during her lunch period and had lunch with multiple people. She communicated with Gran a little during fourth period, before lunch, and got her phone taken away. She did not get her phone back until the end of lunch, so she used the phone of Samantha Powell, a friend, to text him during lunchtime. She asked Gran what he was doing, and he said he was at Pike's house.

When told the detectives already knew what was in the text messages and that she was in a bad "pickle," defendant said she was trying to forget about it. Garibay had her start from the time she knew Pike was back in town. Defendant admitted she was very upset. She would be okay for a little while, but then the day Pike kicked her out of the house, defendant made a couple of death threats toward her. She said something like she wanted her dead, and Gran took it literally. Defendant was aware Gran was "head over heels" for her. She related that when he went to Pike's house, defendant thought he was just joking around when he said he was going to kill her. Detectives then informed defendant that she was lying, and they played part of the recorded pretext call for her. They told her Gran was "done" and that if she told one more lie, the interview was over

14.

and she was going to jail.  They told her she would be charged as an adult and needed to help herself.

Defendant related that Gran told her the murder weapon was a dumbbell, and that he hit Pike across the head with it two times.  Defendant did not know what he did with the dumbbell.  He said he then slit her throat.  He also said he did something else, but he would not tell her what it was.  She guessed perhaps he raped Pike.  Defendant admitted defendant was supposed to take "a wire thing" and do something to Pike.  When she was texting with him at lunchtime, she was supposed to think of ways.  He said "fireball," like burning down the house.  That would not work, so defendant suggested poison.  That did not work, so defendant just told him "to do whatever."  When reminded the detectives had the text messages and knew defendant had sent a message to Gran telling him to delete his messages, defendant admitted she told Gran to rape Pike.  She denied telling him to cut her throat, however.

Defendant related that she and Gran had been planning this since December 2007.  When defendant got kicked out of the house, she got really angry and "just snapped."  She went home and told Gran that she wanted Pike "gone," meaning dead.  Later, when Gran asked defendant what she wanted for Christmas, defendant guessed she said she still wanted Pike dead.  Defendant told Gran four or five times that she wanted Pike dead.  Knowing how much Gran loved her, she told him to do it as soon as possible.  She did not really think he actually would do it.  When he did not do it, however, she was frustrated with him.  Defendant said the benefit to Gran for killing Pike was that since defendant did not like kissing and was not a good kisser, she promised he could teach her how to French kiss if he killed Pike.  Also, he supposedly got weird feelings from killing people.  Gran knew that by killing Pike, defendant would probably have a good chance of being with Thomas.  Defendant told Gran she did not know what she wanted.

Gran texted defendant that it was done, meaning Pike was gone.  Defendant tried not to believe it.  When she came out of denial, she thought maybe she and Thomas could

15.

get back together at some point. When they were in Gran's truck after they left Game Tyme, Gran told defendant that he took Pike's cell phone, broke it, and scattered it in a field. He did not say anything about the dumbbell. He showed defendant a picture of what he had done to Pike. He had taken the picture with his phone. When defendant saw him at Game Tyme, Gran was still wearing pants that had blood stains on them.

Defendant said she felt horrible. When asked if she agreed she had Pike killed, she responded that she agreed she just kind of set up the thing. When asked if anyone else was involved in planning the murder, defendant said Blumberg knew about it. Blumberg was going to be a part of it, but had to go to school on Monday, so she could not be a part of it. She made suggestions about how it should be done. Defendant subsequently admitted she had Pike killed. At Garibay's suggestion, she wrote a letter of apology and stated the events leading up to the murder.[19] She also told detectives Gran had a long black "twisty tie" in his pants. He was going to use it to strangle Pike, but he said she kept putting her hands up. He was going to call it off, but defendant got frustrated and told him to find another way. She admitted she was using her own cell phone to exchange texts with him. She also admitted genuinely wanting Pike dead. She did not think she used Gran.

During the interview, defendant showed no emotion or remorse.

On January 16, Herspring learned from Richards that Gran's father owned a movie theater in Madera, and sometimes the Grans used the theater's dumpster for their residential garbage. Herspring and other officers then searched the three dumpsters behind the theater. Among the trash in the dumpsters was an Office Depot box that contained a small Brinks safe on which Gran's fingerprints were found. In it, along with other items, was a pair of blood-spotted Arizona jeans, size 38 by 30.[20] Gran's father had

---

**19** In the letter, defendant apologized to the Holliers and Pikes for causing them to lose Pike. She stated she and Gran had planned to kill Pike for a while.

**20** The jeans Gran was wearing at the time of his arrest had a size 38 waist.

bought him a pair of Arizona jeans. The DNA profile of the blood on the jeans was consistent with Pike's DNA profile. DNA was also obtained from the inner waistband of the jeans. The profile of the major contributor was consistent with Pike. Gran could not be eliminated as a possible minor contributor. There was also DNA that was foreign to both Gran and Pike. The DNA profile obtained from the fly area of the jeans was consistent with Pike. Statistically, with respect to Pike's profile, that profile would be expected to occur in a randomly selected individual in approximately one in 570 quintillion African-Americans, one in 4.1 quintillion Caucasians, and one in 190 quintillion Hispanics. With respect to the minor contributor, the chance that someone selected at random from a population of unrelated persons could be a possible minor contributor to the mixture was approximately one in 5.7 million African-Americans, one in 280,000 Caucasians, and one in 550,000 Hispanics.

The theater's storage containers, which were locked, were also searched. Among the items inside one was a locked Winchester gun safe that Gran's father said belonged to Gran. Inside were a receipt from a gun store in Arizona with Gran's name on it, several pieces of an assault rifle, a couple of assault rifles, some money, a few pistols in holsters, some bullets, and a towel with small spots of blood on it. Three of the pistols in holsters belonged to Lynn.[21] One was wrapped in the towel, which matched the towels in the Holliers' master bathroom. The DNA profile of the blood was consistent with that of Pike.

Video surveillance from the theater showed Gran and his father driving up to the theater on the morning of January 15. Gran let his father out of the truck, then drove around to the dumpsters.

---

[21]  A few days after Pike was killed, Lynn was allowed to enter the house to get some clothing. He discovered that a trunk he kept in his closet was open and the three guns he kept in the trunk were missing. Two to three weeks earlier, Lynn had taken Gran into the bedroom and showed him those guns. The two guns Lynn kept in a dresser drawer, about which nobody knew, were still there.

Gran had a white Ford F-150 pickup. Among the items found in the truck when it was searched were two black zip ties. One was unclasped. The other was fastened in a circle that was large enough to fit over a human head. There was no blood in the truck other than a spot on the circular zip tie, which tested very weakly positive for possible blood. DNA analysis returned a partial result and a mixture within that result. Pike and defendant both were eliminated as contributors. Gran could not be eliminated as a possible contributor.

Two graphic images (photographs) that had been deleted were recovered from the memory card in Gran's cell phone. The first showed Pike lying on the floor, after she was injured or killed, but before she was disrobed. Although there was no way to determine who took the photograph, the cell phone named the photograph with the time and date at which it took the image. According to the name given the photograph, it was taken at 1:07 p.m. on January 14. The second photograph showed a knife with the handle on the crotch of a person and the blade leaning against the steering wheel of a Ford vehicle. According to the name given the photograph, it was taken at 1:10 p.m. on January 9. There was no way to determine whether either photograph was taken by Gran's phone or by another cell phone and sent to Gran's phone. There was also no way to know if the time and date were accurate.

Verizon records showed text messages received by Gran's cell phone between January 11 and January 16. The records also showed outgoing text messages. The records contained the content of the incoming, but not the outgoing, messages.[22] During that time frame, 408 of the 473 text messages sent from or received by Gran's cell phone were to or from defendant's cell phone.

On January 14, other than a few text messages from Richards received around 8:00 a.m. or 9:00 a.m., Gran's cell phone did not receive texts from any phone other than

---

[22] Verizon's system did not store outgoing message content. In addition, the system maintained text content for only three to five days before it was overwritten.

18.

that of defendant. Gran's phone received no texts from Browning's phone or Blumberg's phone on either January 13 or January 14. Gran's phone did call Blumberg's phone at 12:57 p.m. on January 13, and there were several calls between their phones that afternoon and evening.[23]

Gran's cell phone received a series of texts from defendant's cell phone on January 14. These included: "Kk baby" (10:38:44 a.m.); "Just for today NP perment" (12:05:57 p.m.); "Don't ite up please u still have time" (originated at 12:06:57 p.m. and delivered at 12:07:19 p.m.); "Go a head just kill her" (originated at 12:09:45 p.m. and delivered at 12:10:47 p.m.); "WaT is it" (12:10:32 p.m.); "Oh no u can't do it anther way like shoot her" (12:16 p.m.); "Tile her out um eat and do something" (12:16:48 p.m.); "Get food posino it" (12:19:40 p.m.); "Ok do a break go rape" (originated at 12:26:41 p.m. and delivered at 12:26:49 p.m.);[24] "KK" (12:27:52 p.m.); "Dead" (originated at 1:19:46 p.m. and delivered at 1:20 p.m.); "Wat did u do" (originated at 1:20:37 p.m. and delivered at 1:20:50 p.m.); "Nice" (originated at 1:23:06 p.m. and delivered at 1:23:21 p.m.); and "Ok" (1:25:47 p.m.). Between 12:27 p.m. and 1:19 p.m. on January 14, Gran's cell phone neither sent nor received any text messages.

An autopsy revealed a six-inch cut to Pike's throat that extended across her neck. It struck some of the strap muscles of the neck and the external jugular. Because no large arteries were cut, there would have been no blood being squirted away from the body. There was also a seven-inch horizontal cut that crossed the lower abdomen. It went no deeper than the subcutaneous fat. The fact there was minimal blood in the cut indicated

---

**23** Blumberg denied talking to Gran on the phone at any time between the first attempt to kill Pike and the actual murder. She explained that because defendant and Gran were always together, she would call Gran's phone to talk to defendant. Only if she could not reach defendant that way would she call defendant's phone.

**24** This text was a minute before Gran looked up at the surveillance camera at Game Tyme. Garibay found the Game Tyme video very significant when compared to the text messages, as the video placed Gran at Game Tyme in the morning, then he left. This corresponded to what was written on the mirror in the Hollier bathroom. Gran then returned to Game Tyme. While he was there, defendant told him to go back and find another way to kill Pike.

Pike had already essentially bled out when this cut was inflicted. There was a six-inch horizontal cut across the upper front portion of the right thigh. It also went into the subcutaneous adipose tissue, and was consistent with injury inflicted after Pike had bled out. Pike's left eye was bruised. She had a stab wound in the nape of the neck. It was three-fourths of an inch in length and one and a half inches deep, and showed sharp incised edges on either end. Pike had three abrasions, one next to the right armpit, one in the upper inner aspect of the left thigh, and one behind the left knee. There were no defensive wounds and her fingernail extensions were all intact, indicating there was no struggle.

Pike had five substantial lacerations over the scalp, primarily the back half. All were impact lacerations that resulted from forceful blows to the head. The lacerations ranged in size from two inches to three-fourths of an inch. Some were from perpendicular blows, while others were somewhat tangential (angled). One, which was slightly right of the midline of the back of the head, created an almost five-inch fracture that involved two of the bones of the thickest part of the skull. There were areas of hemorrhage within the cranial cavity. The cause of death was multiple severe blows to the head, inflicting a substantial fracture and creating a very marked cerebral concussion, i.e., diffused axonal injury. There was more loss of blood from the scalp wounds than the neck wound. Pike's bleeding out was the final contribution to death after the brain was already in a state of irreversible nonfunction.

A dumbbell like the one missing its mate at the Hollier residence could have caused the impact lacerations. A knife such as the one shown in the photograph recovered from Gran's phone could have caused the stab wound to the back of the neck, as well as the cuts to the throat, abdomen, and thigh.

Dr. Nelson, who performed the autopsy, originally thought the person who struck the blows to Pike's head probably was right handed.[25] Upon further reflection, however,

---

[25] Gran is left handed.

he decided no determination could be made. Although Nelson could not say exactly where the person striking the blows was standing, he opined that most of the blows came from behind. If Pike was partially lying on the couch with her head on one of the couch's elevated arms or a pillow and looking diagonally across the room at the television, her head would have been somewhat above the arm of the couch and more of the head would have been exposed.[26] It could not be determined whether Pike's injuries were caused by only one individual, as two people could have participated in creating the injuries. The time of death was roughly between 11:00 a.m. and 2:00 p.m.

## II

### DEFENSE EVIDENCE

Browning met Gran in 2006, when Browning was a freshman in high school.[27] They became friends and Browning brought Gran around some other friends, such as Thomas and the group of friends who congregated at Thomas's house in 2007 to play video games.

The day Pike returned to Madera, which was around December 10, 2007, Pike, Thomas, Browning, and Gran went to a movie. Thomas had broken up with defendant to pursue his relationship with Pike, and the following day, Browning received text messages from defendant, threatening Pike. Browning informed Thomas and Pike.

Browning recalled arriving at school on January 14 sometime before 9:00 a.m. Prior to that, he had gone to Game Tyme, where he worked, to vacuum and reset the games. He did not go to Game Tyme any other time that day, and did not recall seeing Gran. He recalled getting out of school at 2:40 p.m. that day, but buses typically did not

---

[26]    The television was on at the time Garibay entered the house shortly after Dilbeck and Spears secured it. Because of the amount of blood saturating the couch, Garibay formed the opinion that was where Pike initially was struck on the head.

[27]    Browning testified under a grant of use immunity.

arrive until around 4:00 p.m.[28]  He arrived at the road by the high school, by bus, at about 4:00 p.m.  He then went to courthouse park, where he met up with some friends, and stayed until sunset.  He then skateboarded the approximately five miles home, arriving around 7:00 p.m.

Upon his arrival home, his mother informed him that Pike had been killed.[29]  She drove him to the Hollier residence, where they stood outside with everybody.  Browning mentioned the threats, and his friends told him to tell the police.  Browning told someone, who instructed his mother to take him and two of his friends to the police department.

At the police department, Browning spoke with Garibay and Herspring.  He told them about the threats he received from defendant; that defendant and Gran were dating; that if anyone were to help defendant, it would be Gran; and that if they were to look into anybody, it should be defendant and Gran.  He never told them that he knew what happened, but merely speculated.[30]  He said he knew who did it, in the sense that he had

[28]    During the 2007-2008 school year, Ripperdan School served as the continuation high school for Madera Unified School District.  Students accumulated at Coyote Lane, which was near Madera High School, and then were transported by bus to Ripperdan, which was in a rural area.  After school, students were bused from Ripperdan back to Coyote Lane.  The trip took approximately 15 minutes, plus the time—perhaps 10 to 15 minutes—it took students to leave the campus, get to the bus loading zone, and board the bus.  On January 14, the school was on a reduced day schedule.  School started at 8:30 a.m. with a period zero and concluded with period four at 12:45 p.m.  Records showed Browning was in attendance for period four, but did not reflect whether he was there until 12:45 p.m.  The records also did not reflect how he got to and from school that day.  Madera High School and Madera South High School also had reduced schedules on January 14.  The lunch period for both schools that day ran from 11:17 a.m. to 12:07 p.m., and the school day ended at 1:45 p.m.

When interviewed on February 4, Browning told Garibay he got out of school at 12:45 p.m.

[29]    Browning's mother recalled picking him up in town and taking him to the Hollier residence, where a friend of hers had told her something was going on.

[30]    Detective Valdez interviewed Browning on the evening of January 14.  When Valdez asked Browning to tell Valdez what he knew, Browning responded something like, "I know everything."  He said Pike had her throat slit, and no defensive marks on her.  He said there was no forced entry, and it had to be someone she knew.  Asked how he knew all that, Browning said he knew through logic and by talking with Hollier.  Valdez did not ask how he had communicated with Hollier.  Asked to confirm Hollier told him that, though, Browning said he

a good suspicion. He suspected Gran and defendant. He never had any discussions with Gran or defendant about killing anyone, and neither ever told him he or she had killed someone or been involved in killing someone.

Browning denied being involved in Pike's murder or having any personal knowledge of who killed her or whether she was killed by more than one person. He also denied having anything to do with the attempt on Pike's life the week before. Phone records showed a six-minute call from Browning to Blumberg at 4:26 p.m. on January 7, but Browning and Blumberg were friends and he may have called to see what she was going. He did not recall calling Gran immediately after his conversation with Blumberg, but he probably did. He did not recall what the calls concerned. He never told anyone he and Gran had a plan to go to someone's front door, punch that person in the face, take the person away, and kill the person.[31]

As of January 14, Cochran considered Blumberg her best friend. At some point after Christmas break started but before Christmas, Blumberg had a party for her parents. Cochran, defendant, and Gran were among those who attended. There were a few moments when defendant, Blumberg, and Cochran were alone together. Defendant was excited to tell the other two that she and Gran were spending more time together. She said he had asked her what she wanted for Christmas and she had said she wanted Pike gone, and Gran had said he would do it. Cochran did not know at the time that meant

---

was there and "they" told him everything. Browning then said he had started talking to an officer and asking him questions, and he overheard the officer say there was no forced entry. Browning also informed Valdez that defendant had made some threats against Pike. He said she did not take their breakup well, and soon after, she started sending Browning threatening text messages, which she knew he would relay to Thomas. These took place around December 11, 2007.

[31] When interviewed by Garibay on February 4, Browning mentioned that he and Gran planned to kill a gang member named Alex, who was cheating with a friend's girlfriend or something similar. It was unrelated to Pike's murder. Garibay did not follow up, because Browning exaggerated a lot of things.

23.

killing Pike. She had heard from Blumberg that they wanted to make Thomas mad at Pike so Pike would no longer be in the picture.[32]

On January 14, Cochran did not see Blumberg at lunch. Blumberg took her and her boyfriend home after school, however. Before taking Cochran home, Blumberg drove defendant to Game Tyme. During the drive, Cochran had no discussion with defendant other than about school.

When they arrived at Game Tyme, defendant—who was very excited that day—got out of the car, where she met with Gran and hugged him. That was out of the ordinary, because defendant and Gran were not very affectionate in public. Gran came over and talked to the group in the car for a couple of minutes, then Blumberg quickly wanted to leave to go home. They dropped Cochran's boyfriend off at his house, then continued to Cochran's home. On the way, Blumberg said defendant had told her that during lunchtime, defendant was texting Gran while he was at Thomas's house, and they were texting back and forth during the time of the murder. Cochran was not aware Pike had been killed. Blumberg said it happened that day, during lunch, but she kept questioning it. She kept asking whether Cochran really thought "they" could have done this. Blumberg said Gran was not sure how to start to hurt Pike, because she had her arm resting on her chin and so he could not strangle her like he wanted. Cochran did not recall Blumberg saying if she was told this or read it herself. At some point Blumberg said she and Gran had had discussions about using zip ties to hurt someone.

Since Blumberg did not raise the subject with a sense of urgency, Cochran did not take it urgently. The next day, however, she noticed a friend crying. When Cochran asked what was wrong, the friend said Pike had been killed. Cochran immediately went to talk to security personnel at the high school. She was then contacted by police.

---

[32] Cochran did not notice any change in Blumberg's demeanor when Pike returned to Madera. Defendant, however, seemed sad, angry, and hurt that Thomas had broken up with her to get back together with Pike. Defendant appeared to be jealous that Pike had come back. Blumberg did not.

A couple of days later, Cochran was asked to wear a wire and ask Blumberg questions for the police department.[33]  On the evening of January 15, prior to the wire situation, Cochran and Blumberg had a fairly lengthy telephone conversation in which they discussed Blumberg's involvement in Pike's death.  Blumberg said that if Cochran had not said anything, she (Blumberg) would not have told anything to the police. Blumberg did not say she was the one who had planned how the murder would take place.  She talked a lot about not believing it would actually happen.  She said she, Gran, and defendant had discussed that Gran had planned to go to Pike's house the week before, but everyone was home sick, so he opted to not go.  Blumberg said that since the murder had not happened then, she had not believed it was going to happen when it did. Blumberg never told Cochran that she wanted to see a person die.

During the conversation in which Cochran wore a wire, Blumberg went into more detail about how Gran entered the home, Pike was resting her hand on her chin, and Gran could not strangle her, and about how Gran and defendant were texting the entire time. This was information Blumberg had received from defendant.  Blumberg also discussed how she was aware of it happening the week before, and how she really did not believe they would attempt it a second time.  She thought they would give up.  Blumberg said she, defendant, and Gran had had conversations about weapons to use to strangle someone, and Blumberg told then she believed the best thing to use would be a zip tie. Blumberg said Gran asked if she wanted to help with the murder, and Blumberg told him no.  Defendant also asked her.  Blumberg related that she told defendant, "You're not going to do this, stop talking about it."  Cochran and Blumberg also discussed the pretext call Blumberg had made to defendant.  Blumberg mentioned she used "we" so defendant would trust her more.

Dr. Hedberg, a clinical psychologist, met with defendant on 13 occasions between August 1, 2008, and June 2014, for the purpose of psychological evaluation and testing.

---

[33]    According to Garibay, this occurred sometime in March.

Defendant's intelligence score was 84, while 100 was average. This meant she had some difficulty with her ability to think and organize thoughts, and to work in a meaningful way with higher levels of decisionmaking. She showed a very high dependency on other people and internal agitation, but no goal-directed behavior. She was lonely and did not have a firm foundation or self-esteem.

Defendant's early family history showed a father who was absent, a grandmother who was dictatorial, and a grandfather who molested defendant when she was about eight or nine years old. When she was about age 10 to 12, an older neighbor boy took advantage of her sexually, and her mother grew ill with cancer. Defendant's submissive personality was forming at this time.

When defendant was around age 13, her father moved to California and her mother, who was increasingly impaired due to the cancer, followed. The family reunited for a time, but defendant's mother died shortly after defendant was arrested in this case.

Defendant was a loner with very few friends. According to Hedberg, people with her characteristics are suggestible or more easily manipulated by others. Someone who submitted to the types of photographs found in defendant's laptop was needy for attention and love, and for someone to make her feel important.[34]

Defendant had very few peer friends. Whether they were taking advantage of her sexually or they were in a social network of some sort, her role was that of a follower who was very passive. The intent was to belong to somebody or something, and to do almost anything to achieve that. Defendant's psychological makeup was not such that she would be the leader of a group and say how things should be done. She would go along even at times she knew she should not, because her need for belonging was so strong. Hedberg would not predict that she could set a goal and accomplish it.

---

[34] Defendant's laptop was seized during a search of her room on January 15. Among the numerous photographs on the laptop were multiple photographs depicting defendant nude or partially nude and with words such as "cunt" and "slave" written on her body.

26.

Hedberg learned that defendant was told by men on the Internet, during a Skyping-type situation, to disrobe and present herself in various sexual poses, which was how the photographs on her laptop came about. In Hedberg's opinion, defendant would tend to follow men much more than women. She would not direct men.

In his report, Hedberg wrote that the records he reviewed indicated defendant had a strong personality and enjoyed a major influence on her peers. He also wrote that she was possessive and exclusionary, and could become extremely angry, hurt, and vindictive if she could not have a relationship she desired or she was rejected in the form up a breakup. She acknowledged to Hedberg that she generally was a nice person, but had a bad side to her. Defendant reported she found the pornography stimulating and arousing to the point she did not need to take antidepressants.

Defendant told Hedberg that her relationship with Thomas was the most emotionally intense, and he was the most serious boyfriend, she had had. The breakup was unexpected and hurtful. Her relationship with Thomas, and his breaking up with her and becoming involved with Pike, were too much for her to deal with at the time.

Defendant told Hedberg that she wrote the letter of apology after she had been sleeping and had overdosed on drugs. She described Gran as sadistic, controlling, and dominant, and she was afraid of him. It was a love/hate relationship, in a sense.

Hedberg found that defendant's key personality disorder was depression. Defendant also had behavioral and mood disorders. Depressed persons might energize themselves to set goals and plans to accomplish them for a day, perhaps, but could not do so on a sustained basis.

Dr. Zimmerman, a psychotherapist and forensic psychologist, interviewed defendant five times between May 2014 and July 2014. He also administered various tests. They showed defendant was of average intelligence, but had some deficits that caused her to function as if she was low average.

Zimmerman found defendant's parents "were just not there" when she was growing up. She had no self-image. She was molested, so her one contact with someone was abusive and exploitive. She concluded she was to be exploited and abused. When the family moved to California, defendant found for the first time ever, in high school, a peer group that accepted her. They were a troubled fringe group, into violent video games and talking about joining the military so they could kill people. Defendant was not a leader, nor would she have been in any group. She was dependent on others to tell her what to do and what they wanted of her, then she would do that and feel acceptable. Defendant had a "typical following relationship" with Blumberg, who had an interest in seeing somebody killed.

Zimmerman diagnosed defendant as having generalized anxiety disorder, and personality disorder not otherwise specified with dependent and schizoid features. He also found her to have serious impairment with social functioning. She tended to be detached, preoccupied, and in her own little world. She was dependent on others for direction. The text messages sent from her cell phone were inconsistent with her personality traits. Defendant related that she was physically present during discussions of Pike's potential death, but then she "check[ed] out" as a coping mechanism. This was consistent with her personality traits. Zimmerman wrote in his report that if defendant sent the text messages and was not influenced by another, it would seem she played an active directing role in the murder. Her playing an active role was unlikely, based on the results of the psychological evaluation. Although defendant told detectives she sent the texts, under duress she could say just about anything to end the questioning.

In June or July 2014, defendant told Zimmerman that she and Gran had been in a relationship until recently. Defendant said she considered Gran the only man with whom she had been in love. Asked if she meant she was in love with a murderer, she said it was hard and she did not understand half of it. Zimmerman's testing indicated defendant was a very damaged individual who sought out the company of other damaged individuals.

28.

### ADMISSION OF GRAN'S CONVICTIONS AND RELATED INFORMATION

Defendant contends her rights to confrontation, jury trial, due process, and a fair trial were violated by the admission of Gran's convictions and related information. The Attorney General says any error was harmless beyond a reasonable doubt. We agree with the Attorney General.

### A.    Background

Defendant moved, in limine, to exclude the fact Gran was convicted and sentenced for Pike's homicide. She argued she had the right to a jury trial on the criminal accusations against her and on the issue of who killed Pike, and to confront witnesses who would offer testimony on that fundamental issue. The People viewed defendant as taking the position all evidence introduced during the guilt phase of Gran's trial had to be presented during defendant's trial to prove who actually killed Pike, and argued that position was not supported by the law. Relying on Evidence Code section 452.5 and cases construing that statute, the People argued they could introduce a certified record of Gran's convictions to prove both that he suffered the convictions and that he committed the underlying crimes.

During argument on the issue, defense counsel asserted that if jurors were told Gran was convicted of murdering Pike, they would automatically conclude that because defendant was with Gran, she was also guilty of the murder. Counsel argued it was not akin to res judicata, where since Gran was found to be the murderer in one case, he must be the murderer in this case without any further proof. Rather, the People had to prove in *this* case that there was a murder, how it took place, who committed it, and that Gran and defendant were coconspirators in the murder. Defense counsel stated he was willing to stipulate to a lot of things, such as the DNA evidence, but he had a right to present

---

[*]     See footnote, *ante*, page 1.

29.

evidence that pointed to a different picture than that painted by the People. The prosecutor responded that who committed Pike's murder was not an issue of first impression, but rather had been addressed by other courts. He again cited Evidence Code section 452.5 and the cases construing that statute as authority for his position.

The trial court ruled the prosecution would be allowed to use Gran's prior record of conviction pursuant to Evidence Code section 452.5, subdivision (b), which, the court found, expanded the hearsay exception to allow a conviction to serve as evidence of underlying misconduct. The court observed, however, that nothing about allowing the convictions as evidence of Gran's conduct prevented the defense from showing there may have been other perpetrators of the crime. The prosecutor confirmed it was not the People's intention to foreclose the defense from pursuing the theory that someone other than Gran was involved, should the defense choose to do so.

The trial court subsequently admitted into evidence certified copies of the following documents in Gran's case: (1) the second amended information, showing Gran was charged with the murder of Pike with a lying-in-wait special circumstance, conspiracy to commit murder, residential burglary, and three counts of theft of a firearm; (2) the verdict forms showing Gran was convicted of first degree murder with a lying-in-wait special circumstance, conspiracy to commit murder, first degree burglary in which a person not an accomplice (Pike) was present in the home, and three counts of grand theft of a firearm; and the determinate and indeterminate abstracts of judgment showing Gran's sentence for the crimes.[35]

---

[35] It was explained to the jury that the determinate abstract of judgment erroneously showed Gran was convicted of robbery, and that an amended document would be prepared to show he actually was convicted of residential burglary.

In count 2 of the second amended information, Gran was charged with conspiring to commit murder with a person or persons whose identity was unknown. Four overt acts were alleged: (1) defendant communicated to Gran her desire to have Pike killed; (2) defendant communicated to Gran different mechanisms to use to murder Pike; (3) Gran communicated to defendant that he was unable to murder Pike the morning of January 14, 2008, by means of placing a zip tie around her throat; and (4) Gran returned to Pike's residence at defendant's

## B.    Analysis

Evidence Code section 452.5, subdivision (b)(1) provides, in pertinent part: "An official record of conviction certified in accordance with subdivision (a) of [Evidence Code] Section 1530 … is admissible under [Evidence Code] Section 1280 to prove the commission, attempted commission, or solicitation of a criminal offense, prior conviction, service of a prison term, or other act, condition, or event recorded by the record." Evidence Code section 1280 provides: "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered in any civil or criminal proceeding to prove the act, condition, or event if all of the following applies: [¶] (a) The writing was made by and within the scope of duty of a public employee. [¶] (b) The writing was made at or near the time of the act, condition, or event. [¶] (c) The sources of information and method and time of preparation were such as to indicate its trustworthiness."

Evidence Code section 452.5 renders the evidence of Gran's convictions and related information admissible *as against a hearsay objection.* (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1460; accord, *People v. Rauen* (2011) 201 Cal.App.4th 421, 425.) It does not render such evidence admissible in every instance, even assuming relevance. (See *People v. Cummings* (1993) 4 Cal.4th 1233, 1294, disapproved on another ground in *People v. Merritt* (2017) 2 Cal.5th 819, 831; *People v. Leonard* (1983) 34 Cal.3d 183, 188.) "The general rule is that evidence regarding the guilty plea or conviction of a coparticipant in a crime is not admissible to prove guilt of a defendant. [Citations.] The rationale for the rule is that a guilty plea or conviction of a participant is irrelevant to

---

urging and murdered Pike, then informed defendant of the murder. The verdict form for count 2 did not specify which overt acts were found by Gran's jury.

The first amended information in defendant's case alleged, as overt acts: (1) Gran went to Pike's residence on January 14, 2008, but was physically unable to murder Pike at that time; (2) Gran communicated to defendant his physical inability to commit the murder; (3) defendant communicated to Gran different mechanisms to use to murder Pike; and (4) Gran returned to Pike's residence and murdered Pike, then informed defendant of the murder.

whether another person was positively and correctly identified as a coparticipant, and merely invites the inference of guilt by association. [Citations.]" (*People v. Neely* (2009) 176 Cal.App.4th 787, 795.) Such evidence " 'raises the concern that a defendant might be convicted based upon the disposition of the charges against the [coconspirator], rather than upon an individual assessment of the remaining defendant's personal culpability.' [Citation.] Indeed, improper use of a coconspirator's conviction infringes on the principle that the 'central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence.' [Citation.]" (*U.S. v. Mitchell* (4th Cir. 1993) 1 F.3d 235, 240.)

"[A]n appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence." (*People v. Waidla* (2000) 22 Cal.4th 690, 724 (*Waidla*).) We cannot fault the trial court for failing to find the evidence irrelevant, or at least more prejudicial than probative under Evidence Code section 352, since defendant did not object on those grounds. (See *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 409–410; *People v. Maciel* (2013) 57 Cal.4th 482, 531.)

Defendant did object on confrontation clause and jury trial right grounds, however. Under *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), only the admission of testimonial hearsay statements violates the confrontation clause (*People v. Gutierrez* (2009) 45 Cal.4th 789, 812). There is some question whether evidence of the kind at issue here is testimonial. (See *People v. Taulton* (2005) 129 Cal.App.4th 1218, 1224–1225; see also *People v. Moreno* (2011) 192 Cal.App.4th 692, 709–711; *People v. Morris* (2008) 166 Cal.App.4th 363, 367–373.)

Nevertheless, it seems clear—and the Attorney General does not dispute—that if the trial court abused its discretion by admitting the evidence (a question we need not decide, but which seems virtually indisputable), defendant's constitutional rights were implicated by the error. (See, e.g., *Kirby v. United States* (1899) 174 U.S. 47, 55–56, 60–

61; *People v. Jennings* (2010) 50 Cal.4th 616, 666 (*Jennings*).) Accordingly, the applicable standard of prejudice is that of *Chapman v. California* (1967) 386 U.S. 18, 24, i.e., reversal is required unless the error was harmless beyond a reasonable doubt (see, e.g., *Sullivan v. Louisiana* (1993) 508 U.S. 275, 279; *Olden v. Kentucky* (1988) 488 U.S. 227, 232; *Jennings*, at p. 666). Under *Chapman*, the inquiry "is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." (*Sullivan v. Louisiana*, at p. 279.)

We conclude any error was indeed harmless beyond a reasonable doubt. Defendant never claimed Gran was not involved in Pike's murder, only that he did not act alone and conspired with someone other than defendant. Despite admission of the challenged evidence, the prosecutor essentially re-proved the People's case against Gran and never argued Gran's convictions proved defendant was guilty. To the extent the abstracts of judgment improperly placed considerations of punishment before the jury, jurors were instructed they were not to consider or discuss penalty or punishment in any way. Nothing suggests they failed to follow this instruction. Because defendant was tried as an aider and abettor, admission of the challenged evidence did not make a finding of her guilt a foregone conclusion, or preclude her from presenting the defense that Blumberg, not she, was the true instigator, and that Gran did not act alone in killing Pike. Finally, the evidence against defendant—even as to lying in wait, which we discuss in more detail, *post*—was overwhelming.[36]

---

[36]    While *Chapman* review does not look solely to the strength of the evidence, that factor is appropriately considered in assessing prejudice. (See, e.g., *People v. Covarrubias* (2016) 1 Cal.5th 838, 929 (*Covarrubias*); *People v. Capistrano* (2014) 59 Cal.4th 830, 873; *People v. Rutterschmidt* (2012) 55 Cal.4th 650, 661; *People v. Rogers* (2009) 46 Cal.4th 1136, 1167-1168.)

**ADMISSION OF STATEMENTS MADE BY GRAN IN CONJUNCTION WITH HIS NGI PLEA**

Defendant says her rights to confrontation, due process, and a fair trial were violated by admission of Gran's statements to a psychologist who interviewed him in conjunction with his NGI plea. We conclude any error was harmless beyond a reasonable doubt.[37]

## A.    Background

Gran pled not guilty and not guilty by reason of insanity. In conjunction with his NGI plea, he was examined and interviewed by Dr. Taylor, a court-appointed psychologist, pursuant to Penal Code section 1027.

When called by the People as a witness at defendant's trial, Gran asserted his Fifth Amendment privilege against self-incrimination and refused to testify. The prosecutor then sought to call Taylor to testify to statements against penal interest Gran made during the NGI evaluation. The prosecutor's stated purpose was to rebut the defense's attempt to suggest that someone other than Gran—specifically, Browning—killed Pike.

Defendant objected to Taylor testifying. Defense counsel argued that but for Gran's NGI plea, the statement would not even exist. He also argued that any statements regarding defendant would leave defendant without the ability to cross-examine Gran—the maker of the statements—and would thus deprive defendant of the right of confrontation and any ability effectively to cross-examine Taylor. Defense counsel further argued the statements were not against penal interest and did not fall within any other hearsay exception, since any conspiracy clearly had ended by the time the statements were made. He noted that Taylor could only recite what Gran told him, and had no basis to know if the statements were true.

---

\*        See footnote, *ante*, page 1.

[37]        Defendant claims the Attorney General has made no attempt to explain how the error could be deemed harmless in this case. Although the Attorney General certainly could have been more thorough in this regard, he did not fail to address the issue altogether.

After argument concerning whether the statements the prosecutor sought to use, which did not implicate defendant, were against Gran's penal interest and trustworthy, the trial court ruled Gran's statements were admissible, under Evidence Code section 1230, to the extent they related to Gran. Anything Gran said about defendant, however, was inadmissible, because defendant would be deprived of her right to confront and cross-examine Gran, who was unavailable as a witness.

Taylor testified that he conducted an evaluation of Gran that included interviewing him regarding Pike's killing. Gran told Taylor that sometime in January, Gran went to Thomas's house to see if he could kill Pike, but Pike was not alone. He then returned on January 14 to kill her, but there was no opportunity for him to get the zip tie around her throat. Gran explained to Taylor that with his left arm, he struck Pike in the side of the head with a dumbbell, then grabbed his pocket knife, slit her throat, stabbed her in the back of the neck, cut her belly, and slit her right thigh. He then stole some video games, a couple of DVD's, and three pistols from the residence. He also took the dumbbell and Pike's cell phone. Gran related that he threw the dumbbell, and broke Pike's cell phone and threw it and the knife out in a field.

On cross-examination, defense counsel elicited that Taylor was court-appointed to conduct an evaluation of Gran's mental state at the time of the offense. During the interview, Gran stated he was left handed. Taylor did not ask Gran whether Browning also participated in killing Pike. Gran said Blumberg wanted to partake in killing someone, as she wanted to see what it would be like to see somebody die. In terms of the dumbbell, Gran said he picked up a five-pound and a 20-pound "neoprene stuff." Taylor did not inquire what "stuff" meant. Taylor did not believe Gran was malingering and found no reason to disbelieve his statements.

**B.     Analysis**

Once again, we apply the abuse of discretion standard of review to the trial court's admission of the challenged evidence.  (*Waidla*, *supra*, 22 Cal.4th at p. 725; *People v. Rowland* (1992) 4 Cal.4th 238, 264.)

There seems little doubt Gran's statements fell within the exception to the hearsay rule for declarations against interest contained in Evidence Code section 1230.[38]  "A party who maintains that an out-of-court statement is admissible under this exception as a declaration against *penal* interest must show that the declarant is unavailable, that the declaration was against the declarant's penal interest, and that the declaration was sufficiently reliable to warrant admission despite its hearsay character.  [Citation.]  To determine whether the declaration passes the required threshold of trustworthiness, a trial court 'may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.'  [Citation.]"  (*People v. Cudjo* (1993) 6 Cal.4th 585, 607 (*Cudjo*).)

Gran was unavailable as a witness because he had invoked his privilege against self-incrimination, which remained available to him because his case was not yet final on appeal.  (*Cudjo*, *supra*, 6 Cal.4th at p. 607; see *Mitchell v. United States* (1999) 526 U.S. 314, 326; *In re Robert E.* (2000) 77 Cal.App.4th 557, 560.)  His statements—which amounted to a confession that he murdered Pike—subjected him to a risk of criminal liability even thought they were made in the context of an NGI plea, and therefore were, on their face, against his penal interest.  (See *Cudjo*, at p. 607.)  Given the circumstances

---

[38]     Evidence Code section 1230 provides:  "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true."

under which the statements were made and to whom, the trial court had discretion to conclude they were trustworthy. (*Ibid.*)

The question is whether defendant's constitutional rights were violated by admission of the evidence.[39] Only testimonial statements implicate a defendant's confrontation rights. (*Davis v. Washington* (2006) 547 U.S. 813, 821; *Crawford*, *supra*, 541 U.S. at p. 68.)[40] Since Taylor was appointed, pursuant to Penal Code section 1027, to assist the trier of fact in determining the issue of Gran's sanity at the time of the offenses (*People v. Lee* (1930) 108 Cal.App. 609, 612; see *Sharp v. Superior Court* (2012) 54 Cal.4th 168, 173), a cogent argument can be made that Gran's statements to him were indeed testimonial (see generally *Ohio v. Clark* (2015) 576 U.S. ___, ___–___ [135 S.Ct. 2173, 2179–2181]; *People v. Lopez* (2012) 55 Cal.4th 569, 581–582).

---

[39] Although the heading to this issue in defendant's opening brief asserts a violation of her rights to confrontation, due process, and a fair trial, defendant actually addresses only the asserted confrontation violation. We do likewise. We see nothing in the record or the briefs to suggest a viable claim exists based on due process or fair trial rights apart from the confrontation issue.

[40] In her opening brief, defendant quotes *People v. Anderson* (1987) 43 Cal.3d 1104, 1120 for the proposition that "[a] nontestifying codefendant's extrajudicial self-incriminating statement that inculpates the other defendant is generally unreliable and hence inadmissible as violative of that defendant's right of confrontation and cross-examination, even if a limiting instruction is given. [Citation.]" As *Anderson* makes clear (*ibid.*), this is the rule of *Bruton v. United States* (1968) 391 U.S. 123, 126–137. Although courts occasionally speak in terms of *Bruton* addressing situations in which the extrajudicial confession of one defendant incriminations another defendant *jointly charged* (e.g., *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1204, disapproved on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216), most hold *Bruton* applies only to joint *trials* (e.g., *Richardson v. Marsh* (1987) 481 U.S. 200, 207; *People v. Montes* (2014) 58 Cal.4th 809, 867; *People v. Carter* (2003) 30 Cal.4th 1166, 1208–1209; *U.S. v. Johnson* (6th Cir. 2009) 581 F.3d 320, 326). Defendant and Gran were not tried together. Moreover, *Bruton* applies only to facially incriminating confessions. (*Richardson v. Marsh*, at p. 207.) "The class of inferentially incriminating statements under *Bruton* is limited to 'obvious[]' ones, 'inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial.' [Citation.]" (*Montes*, at p. 867, quoting *Gray v. Maryland* (1998) 523 U.S. 185, 196; see *U.S. v. Lung Fong Chen* (2d Cir. 2004) 393 F.3d 139, 150.) The statements of Gran that were admitted at defendant's trial made absolutely no reference to defendant, directly or by implication. Thus, regardless of whether *Bruton* applies only to testimonial statements post-*Crawford* (see, e.g., *U.S. v. Johnson*, at p. 326), it does not apply here, as defendant acknowledges in her reply brief.

We need not decide this question, however, since "*Crawford* addressed the introduction of testimonial hearsay statements against a defendant. [Gran's] redacted statement contained no evidence against defendant. [Citation.] Thus, it cannot implicate the confrontation clause. [Citations.] The same redaction that 'prevents *Bruton* error also serves to prevent *Crawford* error.' [Citation.]" (*People v. Stevens* (2007) 41 Cal.4th 182, 199; see *U.S. v. Lung Fong Chen*, *supra*, 393 F.3d at p. 150.)

Defendant disputes this conclusion. She argues Gran's statements were directly related to the scope of defendant's liability as an aider and abettor, contained the only direct evidence of the circumstances of the crime, and were relied on by the prosecution as support for the theory the murder took place by means of lying in wait. If error in admitting Gran's statements to Taylor occurred, however, we conclude it was harmless beyond a reasonable doubt. (See *Jennings*, *supra*, 50 Cal.4th at p. 652.)

There was overwhelming circumstantial evidence, apart from Gran's statements, concerning how the murder occurred. (See *Jennings*, *supra*, 50 Cal.4th at p. 652; *People v. Pokovich* (2006) 39 Cal.4th 1240, 1254–1255; see also *Harrington v. California* (1969) 395 U.S. 250, 254.) In this regard, Gran's statements merely corroborated what defendant herself admitted and what the police investigation and autopsy revealed. (See *People v. Jenkins* (2000) 22 Cal.4th 900, 1016.) The prosecutor never argued the statements implicated defendant, but rather that they implicated Gran himself as the murderer. As we observed, *ante*, the defense never disputed Gran was involved in the actual killing. The statements had little if any effect on defendant's theory Browning was involved, since Taylor never asked Gran about Browning, and evidence concerning Browning's role (or lack of role) in events was thoroughly explored at trial. However, the statements furnished some support for defendant's theory Blumberg—not defendant—was Gran's coconspirator. In light of the foregoing and the overwhelming

evidence of defendant's guilt, both with respect to premeditation and lying in wait, we reject her assertion of prejudicial error.[41]

## III[*]

### ALLEGED INSTRUCTIONAL ERROR

Defendant contends the jury was instructed in a manner that improperly allowed her to be found guilty of first degree murder based on Gran's mental state rather than her own. She points to CALCRIM No. 521, which told jurors:

> "The defendant has been prosecuted for first-degree murder under two theories:
>
> "Number 1, the murder was willful, deliberate and premeditated;
>
> "And, number 2, the murder was committed by lying in wait.
>
> "Each theory of first-degree murder has different requirements and I will instruct you on both.
>
> "You may not find the defendant guilty of first-degree murder unless all of you agree that the People have proved that the defendant committed murder, but not all of you need to agree on the same theory.
>
> "Number 1, deliberation and premeditation.
>
> "The defendant is guilty of first-degree murder if the People have proved that he/she acted willfully, deliberately, and with premeditation. The defendant acted willfully if he/she intended to kill. The defendant acted deliberately if he/she carefully weighed the considerations for and against his/her choice and, knowing the consequences, decided to kill. The defendant acted with premeditation if he/she decided to kill before completing the acts that caused death.
>
> "The length of time that a person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rationally [*sic*], impulsively, or without careful consideration is

---

[41] We reach the same conclusion with respect to any claims of due process or fair trial right violations. (See *Jennings*, *supra*, 50 Cal.4th at p. 666.)

[*] See footnote, *ante*, page 1.

not deliberate and premeditated.  On the other hand, a cold, calculated decision to kill can be reached quickly.  The test is in the extent of the reflection, not the length of time.

"Two, lying in wait.

"The defendant is guilty of first-degree murder if the People have proved that the defendant murdered while lying in wait or immediately thereafter.  The defendant murdered by lying in wait if:

"He/she concealed his/her purpose from the person killed.

"He/she waited and watched for an opportunity to act.

"And, three, then from a position of advantage, he/she intended to and did make a surprise attack on the person killed.

"The lying in wait does not need to continue for any particular period of time, but its duration must be substantial enough to show a state of mind equivalent to deliberation or premeditation.  Deliberation means carefully weighing the considerations for and against a choice and, knowing the consequences, deciding to act.  An act is done with premeditation if the decision to commit the act is done before the act is done.

"A person can conceal his or her purpose even if the person killed is aware of the person's physical presence.

"The concealment can be accomplished by ambush or some other secret plan."

Defendant argues that by referring to "he/she" throughout, the instruction permitted the jury to rely on either defendant's or Gran's mental state to find defendant guilty of first degree murder.  She also says the instruction allowed the jury to base a finding of first degree murder on Gran's actions constituting lying in wait, without regard for whether defendant was aware of those actions or intended them.  Because the jury was told Gran was convicted of first degree murder and the lying-in-wait special circumstance was found true as to him, defendant claims, the jury likely found defendant

40.

guilty of first degree murder without an evaluation of her mental state, thereby requiring reversal or reduction of her first degree murder conviction.[42]

" 'A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant. [Citations.]' [Citation.] ' "[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." [Citations.]' [Citation.]" (*People v. Solomon* (2010) 49 Cal.4th 792, 822; accord, *Estelle v. McGuire* (1991) 502 U.S. 62, 72 & fn. 4.) "Also, ' " 'we must assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' [Citation.]" ' [Citation.]" (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 475 (*Sattiewhite*).)

We find no reasonable likelihood the jury was misled in the manner defendant now claims.

" '[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator, and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages, or instigates, the commission of the crime.' [Citations.]" (*People v. Johnson* (2016) 62 Cal.4th 600, 630 (*Johnson*).) Thus, " '[a]ider and abettor liability is premised on the combined acts of all the principals, but on the aider and abettor's own mens rea.'[43] [Citation.] [The California Supreme Court has] defined the required mental states and acts for aiding and abetting as: '(a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and

---

[42]    Because jurors made no express finding of premeditation, we cannot simply declare harmless any error in the lying in wait instruction. (See *People v. Nelson* (2016) 1 Cal.5th 513, 552 (*Nelson*); *People v. Guiton* (1993) 4 Cal.4th 1116, 1129.)

[43]    "All persons concerned in the commission of a crime, … whether they directly commit the act constituting the offense, or aid and abet in its commission, … are principals in any crime so committed." (Pen. Code, § 31.)

abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus— conduct by the aider and abettor that in fact assists the achievement of the crime.' [Citation.]" (*People v. Thompson* (2010) 49 Cal.4th 79, 116–117; see *People v. McCoy* (2001) 25 Cal.4th 1111, 1117–1118.)

"To prove first degree murder of any kind, the prosecution must first establish a murder within [Penal Code] section 187—that is, an unlawful killing with malice aforethought. [Citations.] Thereafter, pursuant to [Penal Code] section 189, the prosecution must prove the murder was perpetrated by one of the specified statutory means, including lying in wait, or 'by any other kind of willful, deliberate, and premeditated killing, …' (Italics [omitted].) Lying in wait is the functional equivalent of proof of premeditation, deliberation, and intent to kill. [Citation.]" (*People v. Stanley* (1995) 10 Cal.4th 764, 794–795, fn. omitted.) Nevertheless, lying-in-wait murder— unlike the lying-in-wait special circumstance—does not require intent to kill, but rather " 'only a wanton and reckless intent to inflict injury likely to cause death. [Citation.]' [Citation.]" (*Nelson*, *supra*, 1 Cal.5th at p. 549.) Murder by means of lying in wait requires murder committed under circumstances that include a concealment of purpose, a substantial period of watching and waiting for an opportunity time to act, and a surprise attack on an unsuspecting victim from a position of advantage. (See *People v. Mendoza* (2011) 52 Cal.4th 1056, 1072–1073 (*Mendoza*).)

Defendant was tried on an aiding and abetting theory. The issue thus was not whether *she* killed Pike by means of lying in wait, but rather whether she aided and abetted Pike's killing, and whether the actual killer or killers murdered Pike by means of lying in wait. (See *People v. Bonilla* (2007) 41 Cal.4th 313, 331 (*Bonilla*).) In pertinent part, the jury was instructed:

> "A person may be guilty of a crime in two ways: One, he or she may have directly committed the crime. I will call that person the

perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime.

"A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator.

"To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that:

"Number 1, the perpetrator committed the crime;

"Number 2, the defendant knew that the perpetrator intended to commit the crime;

"Three, before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime;

"And, 4, the defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.

"Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does, in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.

"If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor.

"If you conclude that the defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor."

Jurors were told to consider all of the instructions together. Taken together, the instructions adequately conveyed what jurors were required to find in order to convict defendant of first degree murder on a lying-in-wait theory. Moreover, the prosecutor's summation emphasized the aiding and abetting instructions, and what was required in order to find defendant liable under that theory.[44]

---

[44] Although, of course, it is the law as given by the court and not the attorneys' arguments that control—and defendant's jurors were instructed to follow the law as explained by the court, even if the attorneys' comments conflicted with the instructions—we consider the arguments of

Under the circumstances, we find no reasonable likelihood the instructions could have been understood in the manner posited by defendant. The notion jurors might have relied on Gran's convictions to convict defendant without evaluating defendant's mental state is speculative at best and ignores the overwhelming evidence defendant herself harbored the intent that Pike be killed, premeditated the killing, and knew and intended that Gran would obtain entry to the Hollier residence while concealing his true purpose and then commit a surprise attack on Pike.

## IV[*]

### SUFFICIENCY OF THE EVIDENCE

Defendant contends the evidence was insufficient to support a conviction for first degree murder by means of lying in wait and the lying-in-wait special circumstance. We disagree.

The test of sufficiency of the evidence is whether, reviewing the whole record in the light most favorable to the judgment below, substantial evidence is disclosed such that a reasonable trier of fact could find the essential elements of the crime beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578; accord, *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) "[M]ere speculation cannot support a conviction. [Citations.]" (*People v. Marshall* (1997) 15 Cal.4th 1, 35.) Rather, substantial evidence is that evidence which is "reasonable, credible, and of solid value." (*People v. Johnson*, at p. 578.) An appellate court must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Reilly* (1970) 3 Cal.3d 421, 425.) An appellate court must not reweigh the evidence (*People v. Culver* (1973) 10 Cal.3d 542, 548), reappraise the credibility of the witnesses, or resolve factual conflicts, as these are functions reserved for the trier of fact (*In re Frederick G.* (1979)

counsel in assessing the probable impact of a purportedly ambiguous or erroneous instruction on the jury. (*People v. Young* (2005) 34 Cal.4th 1149, 1202.)

[*]        See footnote, *ante*, page 1.

96 Cal.App.3d 353, 367). Furthermore, an appellate court can only reject evidence accepted by the trier of fact when the evidence is inherently improbable and impossible of belief. (*People v. Maxwell* (1979) 94 Cal.App.3d 562, 577.) This standard of review is applicable regardless of whether the prosecution relies primarily on direct or on circumstantial evidence (*People v. Lenart* (2004) 32 Cal.4th 1107, 1125), and applies to review of special circumstance findings (*People v. Mayfield* (1997) 14 Cal.4th 668, 790–791, disapproved on another ground in *People v. Scott* (2015) 61 Cal.4th 363, 390, fn. 2).

The lying-in-wait special circumstance contains somewhat more stringent requirements than the requirements of lying in wait for first degree murder. (*Johnson*, *supra*, 62 Cal.4th at p. 633; *Mendoza*, *supra*, 52 Cal.4th at pp. 1072–1073.) Accordingly, we focus on them, since, if "sufficient evidence supports the lying-in-wait special-circumstance finding, it necessarily supports the first degree murder verdict based on the theory of lying in wait. [Citation.]" (*Johnson*, at p. 634.)

The lying-in-wait special circumstance "requires ' " 'an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) … a surprise attack on an unsuspecting victim from a position of advantage.…' [Citations.]" ' [Citations.]" (*Johnson*, *supra*, 62 Cal.4th at pp. 629-630.)[45]

The California Supreme Court has "explained the elements of the lying-in-wait special circumstance as follows. ' " 'The element of concealment is satisfied by a showing " 'that a defendant's true intent and purpose were concealed by his actions or

---

[45]    "A 2000 ballot measure … changed the definition of the lying-in-wait special circumstance in [Penal Code] section 190.2, subdivision (a)(15) to delete the requirement that the murder be committed 'while' the defendant was lying in wait and to instead require only the lesser standard that the defendant must have 'intentionally killed the victim *by means of* lying-in-wait.' [Citation.]" (*People v. Sandoval* (2015) 62 Cal.4th 394, 415.) The main change effected by the amendment was to largely eliminate the immediacy requirement case law had placed on the special circumstance in terms of the temporal proximity between the period of concealment and watchful waiting and the lethal acts. (See *People v. Superior Court (Bradway)* (2003) 105 Cal.App.4th 297, 306–308.)

conduct. It is not required that he be literally concealed from view before he attacks the victim.' " ' [Citation.]" ' [Citation.] As for the watching and waiting element, the purpose of this requirement 'is to distinguish those cases in which a defendant acts insidiously from those in which he acts out of rash impulse. [Citation.] This period need not continue for any particular length " 'of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation.' " [Citation.]' [Citation.] 'The factors of concealing murderous intent, and striking from a position of advantage and surprise, "are the hallmark of a murder by lying in wait." [Citation.]' [Citation.]" (*Mendoza*, *supra*, 52 Cal.4th at p. 1073, fn. omitted.)

"A lying-in-wait special circumstance can apply to a defendant who, intending that the victim would be killed, aids and abets an intentional murder committed by means of lying in wait. [Citations.] In this factual setting, the questions are whether the defendant, with the intent to kill, aided and abetted the victim's killing, and whether the actual killer intentionally killed the victim by means of lying in wait. [Citation.]" (*Johnson*, *supra*, 62 Cal.4th at p. 630.)[46]

The evidence adduced at trial is more than sufficient to permit a rational jury to conclude defendant, with the intent that Pike would be killed, aided and abetted Pike's killing, and that Gran—the actual killer—intentionally killed Pike by means of lying in wait. Given Pike's apparent belief she and defendant were friends, the trip to the mall to enable defendant to gain Pike's trust, the lack of forced entry, defendant's texts to Gran, the fact Pike had been texting Thomas but did not use her phone to try to summon help, the absence of defensive wounds, the amount of blood on the sofa, and the fact Pike was struck on the back of her head, the conclusion is virtually inescapable that Gran gained

---

[46]     Defendant says she is "aware of no case where the lying in wait special circumstance was applied to a non-killer who was neither present during the killing, nor a participant in the activities constituting the lying in wait." We do not read *Johnson* or *Bonilla*, *supra*, 41 Cal.4th at page 331, as imposing any such requirements. The California Supreme Court has made clear that "each case necessarily depends on its own facts ...." (*Mendoza*, *supra*, 52 Cal.4th at p. 1075.)

46.

entry to the Hollier residence—after defendant urged him to return and not to give up on killing Pike—by a ruse or pretext such as looking for his keys or playing video games; Pike was alone in the house and therefore isolated from help; Gran watched and waited, with his murderous purpose concealed, until the opportune time to act; and while Pike was sitting or reclining on the sofa in the process of writing her grocery list and watching television, he took her by surprise from a position of advantage by strike her from behind. Accordingly, the evidence was sufficient—even without the evidence of Gran's statements to Taylor and his convictions—to sustain the lying-in-wait special circumstance as to defendant. (See, e.g., *People v. Clark* (2016) 63 Cal.4th 522, 628–629; *Johnson*, *supra*, 62 Cal.4th at pp. 630–633; *People v. Cage* (2015) 62 Cal.4th 256, 279–280; *Mendoza*, *supra*, 52 Cal.4th at p. 1074.) Therefore, it was also sufficient to sustain defendant's conviction for first degree murder committed by means of lying in wait.

Defendant says that to the extent the evidence consisted of Blumberg's statements and testimony, it had to be corroborated, since Blumberg was an accomplice as a matter of law. The trial court found Blumberg to be a disputed accomplice, and instructed the jury to determine whether she was an accomplice and, if so, on the need for corroborating ("supporting") evidence.

The testimony of an accomplice must be corroborated before a conviction can be based thereon.[47] (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1203, disapproved on

---

[47] Penal Code section 1111 provides: "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. [¶] An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

Whether section 1111 of the Penal Code applies to special circumstances, as opposed to convictions, depends on the nature of the special circumstance. "When the special circumstance requires proof of some other crime, that crime cannot be proved by the uncorroborated testimony of an accomplice. But when … it requires only proof of the motive for the murder for which

47.

another ground in *People v. Diaz* (2015) 60 Cal.4th 1176, 1189–1190.) "Testimony" in this regard includes all oral statements made by a coconspirator or an accomplice under oath in a court proceeding, and all out-of-court statements of such persons that are made under suspect circumstances such as police questioning and used as substantive evidence of guilt. (*People v. Williams* (1997) 16 Cal.4th 153, 245.) The requirement is a statutory, not a federal constitutional, one. (*Sattiewhite*, *supra*, 59 Cal.4th at p. 473.)

"An accomplice is a person 'who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given.' [Citations.] In order to be an accomplice, the witness must be chargeable with the crime as a principal [citation] and not merely as an accessory after the fact [citations]. [Citation.] An aider and abettor is chargeable as a principal, but his liability as such depends on whether he promotes, encourages, or assists the perpetrator and *shares* the perpetrator's criminal purpose. [Citation.] It is not sufficient that he merely gives assistance with knowledge of the perpetrator's criminal purpose. [Citations.] [¶] Accomplice status is a question of fact for the jury unless the evidence permits only a single inference. [Citations.]" (*People v. Sully* (1991) 53 Cal.3d 1195, 1227–1228.)

Assuming Blumberg was indeed an accomplice—which, as the trial court found, was open to dispute, particularly in light of questions concerning her intent—her testimony was amply corroborated. "To corroborate the testimony of an accomplice, the prosecution must present 'independent evidence,' that is, evidence that 'tends to connect the defendant with the crime charged' without aid or assistance from the accomplice's testimony. [Citation.]" (*People v. Avila* (2006) 38 Cal.4th 491, 562–563.) "The corroborating evidence may be circumstantial or slight and entitled to little consideration when standing alone, so long as it tends to implicate the defendant by relating to an act

---

[the] defendant has already been convicted, the corroboration requirement of [Penal Code] section 1111 does not apply." (*People v. Hamilton* (1989) 48 Cal.3d 1142, 1177, fn. omitted.)

that is an element of the crime. [Citations.] The independent evidence need not corroborate the accomplice as to every fact on which the accomplice testifies [citation] and need not establish every element of the charged offense [citation]. The corroborating evidence is sufficient if, without aid from accomplice testimony, it ' " 'tends to connect the defendant with the commission of the offense in such a way as reasonably may satisfy a jury that the accomplice is telling the truth.' " ' [Citations.]" (*People v. Vu* (2006) 143 Cal.App.4th 1009, 1022 (*Vu*).)

Here, defendant's own statements to police and texts to Gran furnished corroboration. (See *Vu*, *supra*, 143 Cal.App.4th at p. 1022.) Although Blumberg was the only person to claim defendant planned the mall trip in order to give Gran an "in" to the Hollier residence, Thomas's testimony corroborated the mall trip itself, and Lynn's testimony corroborated the notion Pike believed she and defendant were friends. "[O]nce the corroboration sufficiently establishes the accomplice's believability, the accomplice's evidence may establish many facts or details not related in the independent testimony." (*People v. Maldonado* (1999) 72 Cal.App.4th 588, 598.)

In attempting to convince us there was no substantial evidence the murder was carried out by means of lying in wait, defendant speculates Gran could have entered the house without Pike's knowledge, such as via the dog door. The dog door was in the door between the kitchen and the garage, however, and not in a door that led from the house to the outside. The backyard and side yards were completely fenced in. Since there was no evidence whether the fence gate was secured, it would be speculative to assume Gran could have entered that way unnoticed. While speculation will not support a conviction, neither does it furnish grounds to overturn a conviction. Moreover, we question whether Gran's sneaking into the house would truly undercut a finding of lying in wait, particularly since the period of watching and waiting need not continue for any particular length of time.

Defendant also says the physical evidence was suggestive of a struggle, "in that there was evidence that the couch was broken and rammed into the wall *during the killing*." (Italics added.) This reads too much into the actual evidence. Lynn testified that when he eventually moved back into the house, a HAZMAT worker came to pick up the couch and some of the carpet. When the couch was moved, Lynn discovered a break in the wall behind it. In addition, the backing of the couch had been broken, as if somebody had hit it and forced it into the wall. From Lynn's observations, it appeared as if the blow came from the front of the couch to the back of the couch, causing it to break and then hit the wall. The damage to the wall was only visible once the couch was moved. It had been "[a] long time" since Lynn had actually moved the couch. Detective Hawk, who photographed every part of, and everything in, the residence on the night of the murder, looked for blood spatter behind the couch, and had no recollection of a broken portion of the wall. Had she observed a broken portion, she would have photographed it, as she did the indentation in the dining room wall. Similarly, she did not recall seeing anything broken on the couch. Had she seen something broken, she would have photographed it.

Significantly, the autopsy showed Pike had no defensive wounds and her artificial nail extensions were all completely intact. This gives rise to a reasonable inference of no struggle, as opposed to speculation about when and how the couch and wall were damaged. Moreover, we know of no authority holding that the existence of a struggle precludes a finding of lying in wait. If anything, a struggle simply suggests the surprise attack was not instantaneously successful.

Substantial evidence supports defendant's conviction of first degree murder by means of lying in wait, and the lying-in-wait special circumstance finding.

## IMPOSITION OF LWOP

Defendant was 16 years old at the time Pike was killed. She acknowledges the imposition of an LWOP sentence on a juvenile offender is not categorically unconstitutional, but argues the trial court failed to consider defendant's youthfulness and instead considered why defendant was not entitled to benefit from being considered a juvenile. Because nothing about defendant supports a conclusion of irreparable corruption, defendant contends, her LWOP sentence must be vacated. We do not agree.

### A.    Trial Court Proceedings

The probation officer's report prepared in preparation for sentencing contained a statement by defendant that she " '[a]lways felt somewhat guilty' " and that it bothered her for a long time, until recently when she became a Christian and she changed personally. The report related that defendant obtained her high school diploma in 2009, while in juvenile hall. With respect to probation eligibility and circumstances in mitigation, the report noted defendant was youthful when the crimes were committed and possessed an insignificant prior record of criminal conduct. Based on the special circumstance finding, the probation officer stated defendant's sentence on count 1 was LWOP. The probation officer found the homicide "callous[]," and that defendant was the "mastermind" and "manipulated" Gran. The probation officer found defendant had proven herself to be "extremely selfish, evil, and unsympathetic to the pains" she inflicted on Pike's family and friends. Numerous victim impact letters, as well as letters in support of defendant, were appended to the report.

The People submitted a sentencing brief in which they noted the court had the option, pursuant to Penal Code section 190.5, of sentencing defendant to 25 years to life in prison or LWOP. After reviewing the pertinent law, the People requested that defendant receive LWOP. They argued (1) Defendant set in motion the events that

---

[*]    See footnote, *ante*, page 1.

culminated in Pike's death and insisted Gran go through with the murder, and her life experiences allowed her to gain maturity sooner than others of her age; (2) Although defendant was exposed to a challenging upbringing, the damage and pain she caused to Pike, Pike's family, and the Hollier family weighed heavily against the mitigating evidence presented by Hedberg and Zimmerman at trial; and (3) Defendant was directly involved in Pike's murder and was the driving force behind it.

Defendant also submitted a sentencing brief in which she requested that the court impose a sentence of 25 years to life in prison rather than LWOP. Defendant observed that in determining the appropriate sentence, the trial court was required to take into account the factor set out in *Miller v. Alabama* (2012) 567 U.S. 460 (*Miller*), Penal Code section 190.3, and California Rules of Court, rules 4.421 and 4.423. Defendant argued that while no single factor in mitigation supported a sentence of 25 years to life, the evidence presented at trial concerning her personal life, coupled with her performance while in custody, weighed against a conclusion defendant could never be rehabilitated.

The sentencing hearing began with a number of victim impact statements. The court then observed its discretion whether to impose a sentence of LWOP or 25 years to life on the murder count was governed by Penal Code section 190.5, and that it was required to weigh and consider a number of factors comparable to the list of factors that must be considered in a case in which a court imposed the death penalty, as LWOP was the most severe punishment to which a juvenile offender could be subjected. After argument by counsel, the court stated it had reviewed a number of things, including the probation report and sentencing briefs (including reading the cases cited in those briefs); its own trial notes, with a particular view toward factors that might be mitigating for defendant; the physical evidence; and, because it found the probation officer's report insufficient with respect to defendant's mental health, the transcripts of Hedberg's and Zimmerman's trial testimonies. The court noted it had spent "hours" in the process of going through each of the factors set out in *Miller*, *People v. Gutierrez* (2014) 58 Cal.4th

1354 (*Gutierrez*), and this court's opinion in *People v. Palafox* (2014) 231 Cal.App.4th 68 (*Palafox*).

The trial court then stated:

"The first consideration is the age of the defendant at the time of the crime, including her actual age and any age-related matter suggested by the evidence or by common experience or morality that … might reasonably inform the choice of penalty.

"Brittany Navarra … was approximately 16 and a half years old at the time this [offense] was committed.

"She was a high school student, regularly attending high school …. The planning for this particular homicide [occurred] over an approximately three to four-week period, during the winter recess of the school holidays of 2007, with the actual murder being committed in January 2008, when school resumed.

"As a part of this consideration that relates to actual age, the cases require that the Court consider chronological age and what are described as hallmark features, which include among them considerations such as a teenager's immaturity, impetuosity, and the failure to appreciate risks and consequences. [¶] … [¶]

"The Court, in its evaluation of this, would indicate that hallmark features for a 16-and-a-half-year-old teenage girl[] might include maturity [*sic*], they may include the failure to appreciate risk, but the evidence in this case would show that this particular murder was planned, including significant planning by Ms. Navarra. It was a particularly heinous crime of an innocent person. There's no impetuosity connected with this. There's nothing about this to suggest that it … happened as you see in some of these cases where teenagers decide to rob a liquor store and someone is killed. This, in fact, was deliberate, intentional, premeditated. And … there were a number of opportunities where … the decision to actually commit the murder or the commission of the offense itself could have been called off. And with any amount of consideration, that decision was really in the hands of Ms. Navarra.

"There were lots of opportunity [*sic*] she had to call this off. And she never did, and, in fact, she urged the commission to occur.

"So relating to those teenage emotions and conduct, the Court's further evaluated the—significant motivation for this particular crime, it would appear, based on the evidence … , is jealousy, envy, revenge. These

are not the kinds of considerations that are typically thought of as the teenage considerations with respect to mitigation, but, in fact, are vices of any particular age.

"The evidence from the trial demonstrated that Ms. Navarra was extremely jealous of Ms. Pike; that she was envious of her engagement to Thomas Hollier; that she became enraged by the rekindling of the relationship between Thomas and [Krista]; and that as a part of this, she wanted the ultimate revenge, which was the death of Krista Rae Pike.

"That … the plan is never thought through as a logical plan or that would express any common sense or experience, I think everyone can agree … because part of what has been offered in the case is that Ms. Navarra had the view that if Krista Rae Pike was murdered, that would eliminate her romantic competition and that would result somehow in her reuniting with Thomas Hollier and having a loving relationship. That shows no logical thinking, but I don't think that's related to … teenage immaturity. I think that is more in the thinking that the law considers—a 'depraved mind,' I think is the term that's generally used legally.

"So with respect to age, there's none of the age-related considerations that go towards mitigation on this.

"And … the Courts on this subject particularly reference that there are differences between juvenile and adult minds and issues such as transient rashness, proclivity for risk, and inability to assess consequences, all considerations that lessen a child's moral culpability and enhance the prospect that deficiency could be reformed as time goes on. So again, this goes to someone who … makes a rash decision and a horrible crime is committed and later on that person will become, as an adult, much more thoughtful and appreciative and sensitive to those choices. And the Court doesn't see that … with this particular individual.

"Another consideration required is that the Court evaluate the evidence or the other information in the record regarding the family and the home environment that surrounds the juvenile, and from which she cannot usually extricate herself no matter how brutal or dysfunctional her home life is.

"In this category, there is evidence regarding Ms. Navarra's family history, and it is a terrible one. It is a compelling factor in her favor. Ms. Navarra's mother was terminally ill and she died of cancer shortly after her arrest.

"Her mother's illness at the time of this planning of the crime would indicate she did not have any appropriate familial support. There was no

54.

father in the family. I think she was trying to take care of a younger sibling. And even more damaging to this defendant than her mother's illness is … a personal history for Ms. Navarra of years of sexual abuse and neglect from other family members and from a neighbor. [¶] … [¶]

"The Court went back and reviewed the testimony of Dr. Hedberg and Dr. Zimmerman in this regard and reviewed the photographs.…

"… [I]t would indicate that professional psychologists have evaluated her as depressed, a follower, and a very damaged person. There was a description that she had no positive relationships; that she tended towards having abusive, sexual, and predatory relationships and … this could be seen in the relationships … with the grandfather, with the [I]nternet partners where she … had some pornographic [I]nternet experiences, and her relationship with Dustin Gran, because that also is an abusive and a predatory and, I think, sexual relationship. [¶] … [¶]

"As a part of the testimony in the court, … though[,] the record will show that when Ms. Navarra was interviewed by the psychologists, she also described herself as being moody, angry, having a mean streak, that she didn't like to be controlled, that she didn't like to be unchallenged [*sic*], that she was stimulated by pornography, that she had in the past pulled a knife on her grandfather to stop the abuse, that she had fought with family members and had very difficult relationships with other people.

"The psychologist also commented on her general … intellectual functioning, which was described as low average to average; her educational level, which was described as fifth or sixth grade … on reading and seventh grade in math; the fact she could attend school and she did have some accomplishments. And I'm saying that because I think part of the consideration on this is if you have a person who's developmentally disabled or close to developmentally disabled, very low IQ person, whether the Court should consider that as a part of the mental health ramifications or issues, and Ms. Navarra doesn't have that either. She was going to school; she could do her school work.

"… [O]ne of the things that was compelling in this case is that … she was friends with this group of people, including Thomas Hollier and the friends who got together at that house .… So she could make friends and be friends, but ultimately, she was befriending Krista Pike in order to make the murder more easily accomplished.

"So although the Court sees that she has a record of a dysfunctional and abusive childhood, that that is not compelling in terms of overcoming some of the other factors in this. [¶] … [¶]

55.

"Familial drug or alcohol abuse. I didn't see any drug abuse or alcohol with respect to Ms. Navarra … and I didn't see that as a part of the other family history.

"The lack of adequate parenting or education. She had a mother, but her mother had health problems, didn't otherwise seem there was an issue with that, except for the lack of protection with the other family members.

"Her exposure to violence, her susceptibility, psychological damage or emotional disturbance. I think I've commented on all of those, and there is a clear record on this as a part of the case.

"… I do also want to make that comment that Ms. Navarra was engaging in inappropriate sexual communications, those are the pornographic images .…

"And when I considered that, I thought … there was no evidence that she was forced to do this … or she did that for money or some other reason. And … my comment on this is, I think those images … really belie in the youthfulness on this. And I won't comment on that any further, but they're quite degrading and they're very adult. There isn't anything about them that is juvenile.

"The third consideration is any evidence or information in the record regarding the circumstance of the homicide offense, including the extent of the juvenile defendant's participation in the conduct and the way familial and peer pressures may have affected her, with the general view that a juvenile offender who does not kill or intend to kill, has a—considered a twice diminished moral culpability. I think this goes in part to [defense counsel's] comment that, in fact, Ms. Navarra is not the actual killer here.

"The circumstances of the homicide … , particularly with a view to mitigating her responsibility, … do not help her. Ms. Navarra was responsible for planning the murder; she plotted the befriending of Krista Pike so that the murder plot could be carried out more easily. In the final moments when the murder could have been called off or cancelled, she urged the murderer to get it done. Don't give up.

"Without these ongoing efforts, I agree that there's a good question about whether Ms. Pike would still be alive, whether that murder would ever have been accomplished, in that there was evidence of the text messages from Ms. Navarra to Mr. Gran on the actual morning of the crime showing that.

"The idea that she was not the person … to hit Ms. Pike in the head with the dumbbells, she was not the person to slit Ms. Pike's throat, to

56.

disrobe her, to cut her body, to do all of those things, to stab her in the back of the head, … still does not reduce her responsibility for the crime.

"She had, in fact, suggested to Dustin Gran at some point to poison her, … to break into the house, to rape her, to do something to get this murder done. So the fact that Dustin Gran, who himself is a mentally disturbed person, committed this with some unimaginable violence, … should not come as a surprise to Brittany Navarra who was suggesting that it be done in any number of other horrible ways.

"As a part of this, sometimes in looking at these cases on the sentencing, the fact is there might be someone who is convicted of a murder on an aider or abettor theory because that person is the one driving the getaway car, so they're not in the liquor store when somebody is killed, that's a part of what is considered when you say the person is not the one who actually committed the crime.

"When I thought about Ms. Navarra's responsibility for this, I thought more about the person who makes the bomb; who does all of the things to assemble the bomb, to get the parts, to plan out where it should be done, to make the timing for it, to do everything else. And she's not there when it's lit or when it goes off, but she's done everything else. So the fact that she was not present is not mitigating. The details and the facts of the crime is of no help to her in that consideration.

"Next, is any evidence or other information in the record whether the offender … 'might have been charged or convicted of a lesser offense if not for the … incompetency … associated with youth. For example, the inability to deal with the police or other circumstances.'

"So that relates to some of these cases where young people might be sentenced on a life without parole … where there was ineffective plea bargaining or otherwise, and that consideration doesn't apply in this, … given the state of the evidence and the investigation.

"The fifth is whether there's any other evidence or other information in the record that bears on the … 'possibility of rehabilitation,' … and this comes from the *Miller* … U.S. Supreme Court case where it's generally opined that the child's character, which is the teenage character, is not as well formed as an adult, that traits are less fixed and actions are less likely to be evidence of … 'irretrievable depravity.'

"A consideration there is whether there's a criminal history, and there is no criminal history for Ms. Navarra. That is a consideration in her favor.

57.

"The issue about rehabilitation, I think, is—there's some light on that for Ms. Navarra based upon the letters that were submitted by the Department of Corrections chaplain and the assistant to the chaplain that have indicated that Ms. Navarra has participated in [B]ible study and has completed two courses of [B]ible study and also works with other women who are in custody, and that's good. And that she had completed her education while she's been in custody.

"My own observations of her in the courtroom is that … she's been a model defendant in the courtroom setting.… There's no report in the probation report about any violations when she's been in custody. And I'm reciting these all as considerations the Court has thought about.

"The one concern about this, though, is also that it's been indicated, I think the testimony through the psychologist was that she's maintained her relationship with Dustin Gran. That, to me, is disturbing because if anything, the years that she's been in custody, she's gone through [B]ible study and she's tried to understand what happened, and this is about rehabilitation and thinking about rehabilitation, then why maintain a relationship with the murderer, Mr. Gran? That's contrary, it seems to me, to changing her mindset and lifestyle and choices.

"And the language in these cases is very strong about this. In particular, … the question is whether … each juvenile, can be deemed at the time of sentencing to be irreparably corrupt, beyond redemption, and thus unfit every to re-enter society notwithstanding the diminished culpability and the greater prospects for reform that ordinarily distinguish juveniles from adults.

"I think that is the consideration of all of the factors that come from *Gutierrez.* [¶] … [¶]

"So additional considerations, these are the considerations further out of Penal Code section 190.3(a), the circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true. I think I've commented on most of this, but let me just again say it's the premeditated, brutal murder of a completely innocent 18-year-old girl for purposes of jealousy and for personal gratification.

"There isn't any sense that this was in self-defense or that there was a mistake or there was anything else.

"And with respect to this category, the Court will just reference the pain and suffering that has been endured by the Pike family, by the Hollier family, by the other friends of Krista Rae Pike, and that has been evident in

58.

these Victim Impact Statements and the other statements that are contained in the file … , and it is tremendous. Particularly, in light of all of these circumstances of what this was all about, that it was about some competition over a teenage boy, and the brutality of the murder itself, and that it was done in the home of Krista Pike by someone who was a friend, and planned by someone else who was a friend, or who the victim thought were friends. It's incredibly brutal.

"The second subsection is (b), the presence or the absence of criminal activity by the defendant which involved the use or the attempted use of force or violence or the express or implied threat to use force or violence. This relates to whether she was, in fact, the person who committed the crime, and she's not the actual killer, but I … agree with other descriptions of her as the mastermind. And so I think she's—has responsibility for this.

"There was at the trial evidence also of Ms. Blumberg, and I think … that's a question of fact that's contained in the record.… I don't find that persuasive as a mitigating factor for Ms. Navarra.

"Again, the presence or the absence of felony convictions, prior convictions, she has none.

"Whether or not this was committed while she was under the influence of extreme mental or emotional disturbance. This would be a person who commits a crime while they're under great stress. Her mother was terminally ill at the time and this is likely an extreme disturbance, it would be, for anyone, to know that their mother was terminally ill and particularly if you're a 16-year-old girl and your mother is about to die, that is an extreme disturbance, but I don't see that as related to the facts of this case.

"Whether or not the victim was a participant in defendant's homicidal conduct or consented to the homicidal act.… That's not this case. It doesn't apply to Ms. Navarra.…

"Whether or not the offenses [*sic*] committed under circumstances where the defendant reasonably believed to have moral justification or extenuation for the conduct. So there is no moral justification or extenuation that existed.…

"Revenge and jealousy and envy … do not rise to justifications for any murder.

"(g), whether or not the defendant acted out of extreme duress or under substantial domination of another person.

59.

"In this situation, the Court finds that Ms. Navarra was not under this extreme duress or substantial domination. There's some—might be some dispute about who was dominating who, whether that was Dustin Gran dominating Brittany or Ms. Blumberg's involvement, but I think a fairer reading of the evidence is that Ms. Navarra was, in fact, the person who was dominating the other people.

"She has a history where people abused her and dominated her and did bad things to her. And she found in Dustin Gran a person that she could do that to; that she could tell him what to do, and it could be horrible, and he would do it. And this all started out too, … is that part of the reason for doing this is, Kill Krista Rae Pike for my Christmas present.

"When Dustin Gran said, What do you want for Christmas? I would like you to kill Krista. Of that piece of evidence is particularly chilling.…

"And with that as the starting of this and with the text messages … at the end, which are, don't give up, you can do it, from the start to the finish, she's responsible.

"Another consideration … is whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of her conduct or to conform her conduct to the requirements of law was impaired as a result of mental disease or defect or the effects of intoxication. That does not apply. There's no intoxication defense from Ms. Navarra. There are mental defects and disease, and those apply really to Dustin Gran .… [T]here's no benefit to Ms. Navarra for that. [¶] … [¶]

"(i) of [Penal Code section] 190.3 is age of the defendant at the time of the crime, 16 and a half, that's the other criteria [*sic*] previously discussed from the *Gutierrez* and *Miller* cases.

"(j), whether or not the defendant was an accomplice to the offense and participation was relatively minor. And the Court has recited significant analysis that the defendant was a major participant. She was the person who had the goal for the killing of Krista Pike, who stood to benefit from that in her own way of thinking, and also was a major participant in this because she did have the opportunity to have this … plan cancelled.

"And then (k), any other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime, which would be to consider if there's anything else that the Court might consider as mitigating … , anything mitigating for Ms. Navarra, and the Court finds there is none.

60.

"It does appear there's a reference to becoming a Christian person and having dealt with how she feels about this, there's a reference to that in the probation officer's report.…

"I'll conclude from the probation officer's report that it was a fairly brief comment. I do have in mind Ms. Navarra's police interview when she wrote the letter that she did, and I'll keep that in mind when she wrote what she was thinking about, her feelings right at the time of her interrogation. So I have that in mind as another extenuating consideration, but I don't think it is particularly helpful under the circumstances. I think it shows little, if any, genuine remorse for the magnitude of this crime. [¶] … [¶]

"But in summary, it does appear to the Court this was a premeditated murder of Krista Rae Pike with weeks of planning that went into it. There's no justification but the innocence of this victim in the case, that the actual murder was brutally committed by a person who had mental problems, who was known to Ms. Navarra as a person who aspired to be an assassin, and that for her own purposes, she took advantage of that to have [him] commit a murder for the very adult motives of revenge and jealousy, and so she used Mr. Gran to accomplish these purposes.

"And again, the idea that this murder could have been easily avoided is not lost on the Court.

"Ms. Navarra had an abusive childhood history, and she's had current attempts at purposeful activity while she's in custody. The Court acknowledges those as mitigating factors.

"And finally, the minimal expression, if any, of remorse in her ongoing contact with … the actual murderer, Dustin Gran, the Court considers those as demonstrations, keeping in mind all of the other factors that have been cited already, that those are demonstrations that this defendant, Brittany Navarra, is not rehabilitable [*sic*]. This is consideration of all the factors in this case that have been cited.

"And, of course, this is not a matter … of simply counting the factors, but … a matter of weighing and evaluating all of the considerations that are required by law. And the Court reaching its considered judgment as required by Penal Code sections 190.3 and 190.5 and the case law … of the United States Supreme Court and the Supreme Court for the State of California, in reaching the very serious decision that in this case, the appropriate sentence for Brittany Navarra is a sentence of life in prison without the possibility of parole."

61.

**B.     Analysis**

In *Miller*, *supra*, 567 U.S. at page 479, the United States Supreme Court held that the Eighth Amendment to the United States Constitution "forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders," even those convicted of murder. The court explained: "By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment.… [G]iven all we have said in [various opinions] about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. That is especially so because of the great difficulty … of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' [Citations.] Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Miller,* at pp. 479–480, fn. omitted; see *Palafox*, *supra*, 231 Cal.App.4th at pp. 83–86 [summarizing *Miller*'s underpinnings].) The court emphasized: "Our decision does not categorically bar a penalty for a class of offenders or type of crime .… Instead, it mandates only that a sentence follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty." (*Miller*, at p. 483.)

Penal Code section 190.5, subdivision (b) provides: "The penalty for a defendant found guilty of murder in the first degree, in any case in which one or more special circumstances … has been found to be true … , who was 16 years of age or older and under the age of 18 years at the time of the commission of the crime, shall be confinement in the state prison for life without the possibility of parole or, at the discretion of the court, 25 years to life."

This statute "confers discretion on a trial court to sentence a 16- or 17-year-old juvenile convicted of special circumstance murder to life without parole or to 25 years to life, with no presumption in favor of life without parole." (*Gutierrez*, *supra*, 58 Cal.4th at p. 1360.) In exercising its discretion, a sentencing court must consider the aggravating and mitigating factors enumerated in Penal Code section 190.3 and the California Rules of Court. (*Gutierrez*, at p. 1387.) In compliance with *Miller*, the court must also "consider the 'distinctive attributes of youth' and how those attributes 'diminish the penological justifications for imposing the harshest sentences on juvenile offenders' before imposing life without parole on a juvenile offender. [Citation.]" (*Gutierrez*, at p. 1361.)

As summarized by the California Supreme Court, *Miller* requires that in determining "whether a particular defendant is a ' "rare juvenile offender whose crime reflects irreparable corruption" ' " (*Gutierrez*, *supra*, 58 Cal.4th at p. 1388), a sentencing court must "admit and consider relevant evidence of the following:

> "First, a court must consider a juvenile offender's 'chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences.' [Citations.]…

> "Second, a sentencing court must consider any evidence or other information in the record regarding 'the family and home environment that surrounds [the juvenile]—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional.' [Citation.] Relevant 'environmental vulnerabilities' include evidence of childhood abuse or neglect, familial drug or alcohol abuse, lack of adequate parenting or education, prior exposure to violence, and susceptibility to psychological damage or emotional disturbance. [Citation.]

> "Third, a court must consider any evidence or other information in the record regarding 'the circumstances of the homicide offense, including the extent of [the juvenile defendant's] participation in the conduct and the way familial and peer pressures may have affected him.' [Citations.] Also relevant is whether substance abuse played a role in the juvenile offender's commission of the crime. [Citation.]

"Fourth, a court must consider any evidence or other information in the record as to whether the offender 'might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. [Citations.]

"Finally, a sentencing court must consider any evidence or other information in the record bearing on 'the possibility of rehabilitation.' [Citations.] The extent or absence of 'past criminal history' is relevant here. [Citation.]" (*Gutierrez*, *supra*, 58 Cal.4th at pp. 1388–1389.)

We have set out the trial court's comments at length, *ante*. They demonstrate the court thoroughly and thoughtfully considered and weighed each applicable factor with an eye toward the distinctive attributes of youth and a determination whether defendant was that rare juvenile offender whose crime reflected irreparable corruption. We find its decision to impose LWOP did not "exceed[] the bounds of reason, all of the circumstances being considered" (*People v. Giminez* (1975) 14 Cal.3d 68, 72), and so did not constitute an abuse of discretion (see *Palafox*, *supra*, 231 Cal.App.4th at p. 91). Moreover, "we have subjected the constitutionality of the sentence to our independent review, taking into consideration" all of the pertinent factors under *Miller*, Penal Code section 190.3, and the California Rules of Court, and find no Eighth Amendment violation. (See *Palafox*, at pp. 91–92.)

Defendant argues, however, that the trial court here "failed to consider how the differences attendant to youth 'counseled against' LWOP," and instead "considered how the factors of youth could be deemed to be inapplicable to" defendant. We reject this interpretation of the trial court's remarks. We also reject the notion that the court characterized the hearing as "comparable" to a penalty phase in a capital case and so improperly inquired whether aggravation outweighed mitigation. In actuality, the court merely commented that the factors it was required to consider were comparable to the list of factors that had to be considered in imposing a death penalty. The court expressly stated its understanding it was required to "weigh[] and evaluat[e] all of the considerations that are required by law."

Defendant points out that a trial court abuses its discretion if, in choosing the appropriate sentence, "it relies upon circumstances that are not relevant to the decision or that otherwise constitute an improper basis for decision. [Citations.]" (*People v. Sandoval* (2007) 41 Cal.4th 825, 847.) She says the court's reliance on defendant's continuing relationship with Gran to conclude defendant could not be rehabilitated was irrational and violated defendant's First Amendment right to freedom of association.

In *Dawson v. Delaware* (1992) 503 U.S. 159, the United States Supreme Court held that the First and Fourteenth Amendments prohibited the introduction, in a capital sentencing proceeding, of the fact the defendant was a member of the Aryan Brotherhood *where the evidence had no relevance to the issues being decided in the proceeding*. (*Dawson v. Delaware,* at p. 160.) The high court reasoned that the defendant's right to associate with the Aryan Brotherhood was constitutionally protected and, because of the narrow stipulation about that group into which the prosecution and defense had entered, the evidence had no relevance to the sentencing proceeding. (*Id*. at pp. 164, 165.) The court concluded that the First Amendment prohibited the state "from employing evidence of a defendant's abstract beliefs at a sentencing hearing *when those beliefs have no bearing on the issue being tried*." (*Dawson v. Delaware,* at p. 168, italics added.)

We do not perceive similar irrelevance to defendant's continued relationship with Gran. Gran was not just some friend, but defendant's partner in a brutal murder. Defendant herself described him as sadistic, controlling, and dominant, and said she was afraid of him. In the trial court's view, the continued relationship tended to rebut defendant's claim she had changed. This is a permissible purpose (see *Dawson v. Delaware*, *supra*, 503 U.S. at pp. 167–168), and we do not find the trial court's reliance thereon to be irrational.

In *Palafox*, *supra*, 231 Cal.App.4th at page 73, we stated that "[n]o particular factor, relevant to the decision whether to impose LWOP on a juvenile who has committed murder, predominates under the law. Hence, as long as a trial court gives due

consideration to an offender's youth and attendant characteristics, as required by [*Miller*], it may, in exercising its discretion under Penal Code section 190.5, subdivision (b), give such weight to the relevant factors as it reasonably determines is appropriate under all the circumstances of the case." (See *Bell v. Uribe* (9th Cir. 2014) 748 F.3d 857, 870.)

Recently, however, the United States Supreme Court declared: "*Miller* … did more than require a sentencer to consider a juvenile offender's youth before imposing life without parole; it established that the penological justifications for life without parole collapse in light of 'the distinctive attributes of youth.' [Citation.] Even if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects ' "unfortunate yet transient immaturity." ' [Citations.] Because *Miller* determined that sentencing a child to life without parole is excessive for all but ' "the rare juvenile offender whose crime reflects irreparable corruption," ' [citations], it rendered life without parole an unconstitutional penalty for 'a class of defendants because of their status'—that is, juvenile offenders whose crimes reflect the transient immaturity of youth. [Citation.] As a result, *Miller* announced a substantive rule of constitutional law. Like other substantive rules, *Miller* is retroactive because it ' "necessarily carr[ies] a significant risk that a defendant" '—here, the vast majority of juvenile offenders—' "faces a punishment that the law cannot impose upon him." ' [Citations.]" (*Montgomery*, *supra*, 577 U.S. at p. ___ [136 S.Ct. at p. 734].)

This passage from *Montgomery* has been interpreted as vitiating what we said in *Palafox*, and as requiring a trial court to determine, in order to impose an LWOP term, that, in light of all the *Miller* factors, "the juvenile offender's crime reflects irreparable corruption resulting in permanent incorrigibility, rather than transient immaturity." (*People v. Padilla* (2016) 4 Cal.App.5th 656, 673, review granted Jan. 25, 2017, S23945.)

We need not decide whether *Montgomery* requires such a determination or clarifies that *Miller* evidences a presumption against LWOP, questions that are pending

review in our state Supreme Court in *Padilla* and *People v. Arzate*, review granted January 25, 2017, S238032. Here, the trial court clearly had in mind that the overriding question was whether, in light of all the *Miller* factors and those to be considered under Penal Code section 190.3 and the California Rules of Court, defendant was the rare juvenile offender whose crime reflected irreparable corruption resulting in permanent incorrigibility, rather than transient immaturity. The trial court expressly found defendant could not be rehabilitated and that LWOP was the appropriate sentence. In our view, these express findings, coupled with the court's lengthy comments, show the trial court impliedly found defendant to be the rare juvenile offender whose crime reflects irreparable corruption and permanent incorrigibility, and not transient immaturity. Moreover, the fact the trial court reviewed the information before it with particular regard for anything that might be mitigating for defendant and still found LWOP appropriate demonstrates that any such presumption was rebutted.

## VI

### PROPOSITION 57

In granting rehearing, we asked the parties to submit supplemental briefing regarding whether Proposition 57 applies retroactively to defendant's case. Defendant argues she is entitled to relief under the Act because (1) the provisions of Proposition 57 requiring a juvenile transfer hearing are retroactive to cases not yet final, pursuant to the holding of *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), and (2) retroactivity to juvenile offenders with LWOP sentences is required under *Montgomery*, *supra*, 577 U.S. ___ [136 S.Ct. 718].

### A.     Procedural Background and Proposition 57

Historically, before a minor could be tried in criminal (adult) court, California required a finding the minor was unfit to be dealt with under the juvenile court law. (See, e.g., *Juan G. v. Superior Court* (2012) 209 Cal.App.4th 1480, 1493 (*Juan G.*); *People v. Cardona* (2009) 177 Cal.App.4th 516, 524.) Although, prior to 1999, there were no

67.

provisions for the direct filing (mandatory or discretionary) of charges against juveniles in criminal court (*Juan G.*, at p. 1493), a presumption of unfitness for minors, aged 16 years old or older and charged with specified offenses, was added to the Welfare and Institutions Code[48] in 1979, and extended, in 1994, to minors between the ages of 14 and 16 who were alleged to have committed certain forms of murder (*People v. Superior Court (Jones)* (1998) 18 Cal.4th 667, 680–681, fn. 1).

In 1999, the Legislature added subdivision (b) to section 602, mandating the direct filing of criminal cases against minors 16 years of age or older under specified circumstances. (*Juan G.*, *supra*, 209 Cal.App.4th at p. 1493.) In 2000, voters approved Proposition 21, the Gang Violence and Juvenile Crime Prevention Act of 1998. In pertinent part, it "confer[red] on prosecutors the discretion to bring specified charges against certain minors directly in criminal court, without a prior adjudication by the juvenile court that the minor is unfit for a disposition under the juvenile court law." (*Manduley v. Superior Court* (2002) 27 Cal.4th 537, 545 (*Manduley*); see generally *id*. at pp. 548–550.) Proposition 21 also decreased, to 14, the minimum age for mandatory criminal prosecutions. (*Manduley*, at p. 550.)

Krista Pike was killed on January 14, 2008. Defendant was born June 26, 1991, making her 16 years old at the time of the crimes of which she was convicted. Because the information alleged that Pike's murder was committed by Dustin Gran, with defendant aiding and abetting him, defendant was not subject to the mandatory direct filing provision of former section 602, subdivision (b). She was, however, subject to the discretionary direct filing provisions of former section 707.

Defendant was convicted on September 24, 2014, and sentenced on February 20, 2015. Her notice of appeal was filed on February 20, 2015. On November 8, 2016, while defendant's appeal was pending, voters enacted Proposition 57. It went into effect

---

[48] Further statutory references are to the Welfare and Institutions Code unless otherwise stated.

the next day. (Cal. Const., art. II, § 10, subd. (a).) Insofar as we are concerned, the Act eliminated the People's ability to initiate criminal cases against juvenile offenders anywhere but in juvenile court. The Act also removed the presumption of unfitness that previously attached to the alleged commission of certain offenses.[49]

The purpose of the portions of Proposition 57 that deal with juvenile offenders is to undo Proposition 21. (See generally *People v. Marquez* (2017) 11 Cal.App.5th 816, 821, review granted July 26, 2017, S242660 (*Marquez*).) Thus, two of the Act's stated purposes, contained in uncodified section 2 thereof, are to "[s]top the revolving door of crime by emphasizing rehabilitation, especially for juveniles," and "[r]equire a judge, not a prosecutor, to decide whether juveniles should be tried in adult court." (Voter Information Guide, Gen. Elec. (Nov. 8, 2016) text of Prop. 57, § 2, p. 141.)[50]

B. **Analysis**

There can be no doubt that, had defendant committed her offenses after Proposition 57 went into effect, she would have been entitled to a fitness hearing—with no presumption of unfitness—before her case could be transferred to criminal (adult) court for prosecution.[51] The question we confront is whether Proposition 57 applies to

_____

[49] Section 602 now states: "Except as provided in Section 707, any person who is under 18 years of age when he or she violates any law of this state …, is within the jurisdiction of the juvenile court, which may adjudge such person to be a ward of the court."

Section 707 now provides, in pertinent part: "(a)(1) In any case in which a minor is alleged to be a person described in Section 602 by reason of the violation, when he or she was 16 years of age or older, of any felony criminal statute, … the district attorney … may make a motion to transfer the minor from juvenile court to a court of criminal jurisdiction. The motion must be made prior to the attachment of jeopardy. Upon such motion, the juvenile court shall order the probation officer to submit a report on the behavioral patterns and social history of the minor.… [¶] (2) Following submission and consideration of the report, and of any other relevant evidence that the petitioner or the minor may wish to submit, the juvenile court shall decide whether the minor should be transferred to a court of criminal jurisdiction. In making its decision, the court shall consider [certain specified] criteria."

[50] The Voter Information Guide is available at <http://voterguide.sos.ca.gov/en/propositions/57/> [as of Oct. 6, 2017].

[51] We are not here faced with, and express no opinion concerning, the situation of a minor who was charged in adult court but not yet tried at the time the Act went into effect. (See *People*

juvenile offenders who, like defendant, were charged, tried, convicted, and sentenced before the Act's effective date, but whose cases are not yet final on appeal. (See *Covarrubias, supra,* 1 Cal.5th at p. 935 [for purpose of determining retroactive application of amendment to criminal statute, judgment is not final until time for petitioning for writ of certiorari in United States Supreme Court has passed].) This is a purely legal question we analyze de novo. (See *People v. Arroyo* (2016) 62 Cal.4th 589, 593 (*Arroyo*).)[52]

Defendant says the provisions of Proposition 57 requiring a juvenile fitness/transfer hearing, and repealing the presumption of unfitness, apply to all cases not yet final. We disagree.

In ascertaining whether a statute should be applied retroactively, the intent of the electorate, or the Legislature, "is the 'paramount' consideration." (*People v. Nasalga* (1996) 12 Cal.4th 784, 792 (plur. opn. of Werdegar, J.); see *People v. Conley* (2016) 63 Cal.4th 646, 656.) " ' "In interpreting a voter initiative" ' such as Proposition [57], ' "we apply the same principles that govern statutory construction. [Citation.] Thus, [1] 'we turn first to the language of the statute, giving the words their ordinary meaning.' [Citation.] [2] The statutory language must also be construed in the context of the statute as a whole and the overall statutory scheme [in light of the electorate's intent]. [Citation.] [3] When the language is ambiguous, 'we refer to other indicia of the voters' intent, particularly the analyses and arguments contained in the official ballot pamphlet.' " ' [Citation.] 'In other words, our "task is simply to interpret and apply the

<hr />

v. *Superior Court (Lara)* (2017) 9 Cal.App.5th 753, 758, 773–778, review granted May 17, 2017, S241231; see also *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 288 (*Tapia*).)

[52] This question is pending review before the state Supreme Court in numerous cases, including *People v. Superior Court (Walker)* (2017) 12 Cal.App.5th 687, review granted September 13, 2017, S243072; *Marquez, supra*, 11 Cal.App.5th 816, rev.gr.; *People v. Vela* (2017) 11 Cal.App.5th 68, review granted July 12, 2017, S242298; *People v. Mendoza* (2017) 10 Cal.App.5th 327, review granted July 12, 2017, S241647; and *People v. Cervantes* (2017) 9 Cal.App.5th 569, review granted May 17, 2017, S241323.

initiative's language so as to effectuate the electorate's intent." ' [Citation.]" (*Arroyo*, *supra*, 62 Cal.4th at p. 593.)

"It is well settled that a new statute is presumed to operate prospectively absent an express declaration of retrospectivity or a clear indication that the electorate, or the Legislature, intended otherwise. [Citations.]" (*Tapia*, *supra*, 53 Cal.3d at p. 287.) While the Welfare and Institutions Code does not contain a statutory codification of this principle (cf., e.g., Code Civ. Proc., § 3, Pen. Code, § 3), the California Supreme Court has made clear such statutory language " 'does no more than codify a general rule of construction, applicable as well to statutes containing no such provision. [Citations.]' [Citation.]" (*Stenger v. Anderson* (1967) 66 Cal.2d 970, 977, fn. 13.)

The provisions of Proposition 57 affecting only juvenile offenders contain no express statement regarding retroactivity. Defendant seeks support for her claim of retroactive application in the fact the Act contains no savings clause; the specified purposes of the Act, quoted *ante*; uncodified section 5 of the Act, which says the Act "shall be broadly construed to accomplish its purposes" (Voter Information Guide, Gen. Elec., *supra*, text of Prop. 57, § 5, p. 145); and uncodified section 9 of the Act, which says the Act "shall be liberally construed to effectuate its purposes" (Voter Information Guide, Gen. Elec., *supra*, text of Prop. 57, § 9, p. 146). Our Supreme Court, however, has "been cautious not to infer the voters' or the Legislature's intent on the subject of prospective versus retrospective operation from 'vague phrases' [citation] and 'broad, general language' [citation] in statutes, initiative measures and ballot pamphlets." (*Californians For Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 229–230.) "Accordingly, we will not attempt to infer from the ambiguous general language of Proposition [57] whether the voters intended the measure to apply to … cases [that are not yet final]. Instead we will employ the ordinary presumptions and rules of statutory construction commonly used to decide such matters when a statute is silent." (*Id*. at p. 230.)

" '[A] statute that is ambiguous with respect to retroactive application is construed … to be unambiguously prospective. [Citations.]' " (*Myers v. Philip Morris Companies, Inc.* (2002) 28 Cal.4th 828, 841, quoting, inter alia, *I.N.S. v. St. Cyr* (2001) 533 U.S. 289, 320–321, fn. 45.)  Defendant argues, however, that Proposition 57 falls within the exception to this general principle carved out by *Estrada, supra*, 63 Cal.2d 740.

*Estrada* dealt with a situation in which, at the time of the petitioner's offense (escape without force or violence), the applicable statutes mandated a sentence of at least one year's imprisonment, to commence from the time the prisoner would have been discharged otherwise, with no grant of parole until service of at least two calendar years from the date of the escapee's return to prison after conviction.  After the petitioner committed the crime, but before his conviction and sentence, the statutes were amended to provide for a sentence of six months to five years in prison, with no minimum date for parole eligibility.  (*Estrada, supra*, 63 Cal.2d at pp. 743–744.)[53]  The California Supreme Court stated:

> "The problem, of course, is one of trying to ascertain the legislative intent—did the Legislature intend the old or new statute to apply?  Had the Legislature expressly stated which statute should apply, its determination, either way, would have been legal and constitutional.  It has not done so. We must, therefore, attempt to determine the legislative intent from other factors.
>
> "There is one consideration of paramount importance.  It leads inevitably to the conclusion that the Legislature must have intended, and by necessary implication, provided, that the amendatory statute should prevail. When the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act.  It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply.  The amendatory act imposing the lighter punishment can be applied

---

[53]   "Although parole constitutes a distinct phase from the underlying prison sentence, a period of parole following a prison term has generally been acknowledged as a form of punishment." (*People v. Nuckles* (2013) 56 Cal.4th 601, 609.)

constitutionally to acts committed before its passage provided the judgment convicting the defendant of the act is not final. This intent seems obvious, because to hold otherwise would be to conclude that the Legislature was motivated by a desire for vengeance, a conclusion not permitted in view of modern theories of penology." (*Estrada*, *supra*, 63 Cal.2d at pp. 744–745.)

With respect to Penal Code section 3, the court stated: "That section simply embodies the general rule of construction, coming to us from the common law, that when there is nothing to indicate a contrary intent in a statute it will be presumed that the Legislature intended the statute to operate prospectively and not retroactively. That rule of construction, however, is not a straitjacket. Where the Legislature has not set forth in so many words what it intended, the rule of construction should not be followed blindly in complete disregard of factors that may give a clue to the legislative intent. It is to be applied only after, considering all pertinent factors, it is determined that it is impossible to ascertain the legislative intent. In the instant case there are … other factors that indicate the Legislature must have intended that the amendatory statute should operate in all cases not reduced to final judgment at the time of its passage." (*Estrada*, *supra*, 63 Cal.2d at p. 746.)

We conclude *Estrada* does not require that the provisions of Proposition 57 be applied retroactively to defendant's case. Although *Estrada* has been broadly applied in the past (see, e.g., *People v. Francis* (1969) 71 Cal.2d 66, 75–76 [applying *Estrada* to statutory amendment vesting in trial court discretion to impose either same penalty as under former law or lesser penalty]), the California Supreme Court has since made it clear *Estrada* "supports an important, contextually specific qualification to the ordinary presumption that statutes operate prospectively: When the Legislature has amended a statute to reduce the punishment *for a particular criminal offense*, we will assume, absent evidence to the contrary, that the Legislature intended the amended statute to apply to all defendants whose judgments are not yet final on the statute's operative date. [Citation.]" (*People v. Brown* (2012) 54 Cal.4th 314, 323, italics added, fn. omitted (*Brown*).)

The state high court noted the "limited role *Estrada* properly plays in our jurisprudence of prospective versus retrospective operation" (*Brown*, *supra*, 54 Cal.4th at p. 324), and found *Estrada*'s statement about the rule of construction codified in Penal Code section 3 not being a "straitjacket" (*Estrada*, *supra*, 63 Cal.2d at p. 746), if applied broadly and literally, would "endanger the default rule of prospective operation" (*Brown*, at p. 324). The court concluded: "*Estrada* is today properly understood, not as weakening or modifying the default rule of prospective operation codified in [Penal Code] section 3, but rather as informing the rule's application in a specific context by articulating the reasonable presumption that a legislative act mitigating the punishment *for a particular criminal offense* is intended to apply to all nonfinal judgments. [Citation.]" (*Ibid.*, italics added.) The court rejected the argument *Estrada* should be understood to apply to any statute that reduced punishment in any manner, noting "the rule and logic of *Estrada* is specifically directed to a statute that represents ' "a legislative mitigation of the *penalty for a particular crime*" ' [citation]." (*Brown*, at p. 325, original italics.)

Brown concerned the application of a change in the rate at which prisoners in local custody could earn conduct credits (*Brown*, *supra*, 54 Cal.4th at pp. 317–318), a very different situation than we confront here. Nevertheless, we cannot just blithely write off, on that ground, a pronouncement by our state's highest court that limits the holding in one of that court's prior cases. That the state Supreme Court did not intend this limitation to apply only in the circumstances presented in *Brown* is clearly demonstrated by the fact it cited to a discussion of the default rule of prospective application, and rejection of a broad interpretation of *Estrada*, contained in *Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1207–1209, a civil case. (*Brown*, at pp. 324–325.) The Supreme Court's application of the limitation on *Estrada* in two such disparate scenarios strongly signals its intent that said limitation should be broadly applied. This is especially so when we take into account that court's more recent reference to *Brown* as "acknowledging the

74.

continuing viability of the *Estrada* rule, [but] emphasiz[ing] its narrowness." (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1196, disapproved on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.)

We recognize significant differences exist between juvenile and adult offender laws, and that "[t]he former seeks to rehabilitate, while the latter seeks to punish." (*In re Julian R.* (2009) 47 Cal.4th 487, 496.) We also recognize "the certification of a juvenile offender to an adult court has been … characterized as 'the worst punishment the juvenile system is empowered to inflict.' [Citation.]" (*Ramona R. v. Superior Court* (1985) 37 Cal.3d 802, 810.) Proposition 57 has the potential to reduce the range of permissible punishment—including that applicable to the offenses of which defendant was convicted—for a class of offenders. Nevertheless, no provision of Proposition 57 mitigates the penalty for a particular criminal offense. Accordingly, *Estrada* does not overcome the strong presumption of prospective-only application.

As previously noted, the portions of Proposition 57 applicable only to juvenile offenders contain no express retroactivity provision. By contrast, the Act expressly renders the provisions relating to eligibility for parole consideration retroactive by making them applicable to "[a]ny person convicted … and sentenced." (Cal. Const., art. I, § 32, subd. (a)(1); see *People v. Franklin* (2016) 63 Cal.4th 261, 278 [discussing retroactivity of youth offender parole hearings under Pen. Code, § 3051].) Moreover, section 707, subdivision (a)(1), as amended by the Act, mandates that any motion to transfer the minor from juvenile court to criminal court "*must* be made *prior to the attachment of jeopardy*." (Italics added.)

"The voters are presumed to have been aware of existing law at the time an initiative was enacted. [Citations.]" (*Juan G.*, *supra*, 209 Cal.App.4th at p. 1494.) In addition, we generally assume voters considered the entire text of a proposal submitted to them for enactment. (See *People v. Valencia* (2017) 3 Cal.5th 347, 369.) This being the case, logic dictates that had voters intended the juvenile offender provisions of

75.

Proposition 57 to apply to such offenders who were already tried, convicted, and sentenced, the enactment would have included an express provision to that effect, as did the parole eligibility portions of the Act.

When interpreting a legislative enactment, " '[w]e must … avoid a construction that would produce absurd consequences, which we presume the Legislature [or voters] did not intend. [Citations.]' [Citation.]" (*In re Greg F.* (2012) 55 Cal.4th 393, 406; see *People v. Union Pacific Railroad Co.* (2006) 141 Cal.App.4th 1228, 1257 & fn. 5.) To hold Proposition 57 applies retroactively to defendants who have been convicted and sentenced, but whose judgments are not yet final, would mean an offender such as defendant, who was tried and convicted by a jury of special circumstance murder upon proof beyond a reasonable doubt, and sentenced to LWOP by a court that carefully considered whether to impose a lesser term of 25 years to life as permitted by Penal Code section 190.5, subdivision (b), would be given the opportunity of being released within a matter of a few years (see, e.g. §§ 607, 1769, 1771). This is so even though the LWOP sentence comported with the Eighth Amendment to the United States Constitution, as construed in *Miller, supra,* 567 U.S. 460 and *Montgomery*, *supra*, 577 U.S. ___ [136 S.Ct. 718]. It is difficult to imagine a more absurd result, or that voters intended for such an offender to be returned to society within such a short time.

Nonetheless, defendant asserts retroactivity is required under *Montgomery*, *supra*, 577 U.S. ___ [136 S.Ct. 718]. That case confronted the question "whether *Miller*'s prohibition on mandatory life without parole for juvenile offenders … announce[d] a new substantive rule that, under the Constitution, must be retroactive." (*Id.* at p. ___ [136 S.Ct. at p. 732].) The high court explained that a procedural rule (which generally is not retroactive) " 'regulate[s] only the *manner of determining* the defendant's culpability.' [Citation.] A substantive rule, in contrast, forbids 'criminal punishment of certain primary conduct' or prohibits 'a certain category of punishment for a class of defendants

because of their status or offense.' [Citations.]" (*Ibid.*)  In finding *Miller* announced a substantive rule required to be given retroactive effect, the court explained:

> "*Miller* requires that before sentencing a juvenile to life without parole, the sentencing judge take into account 'how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.' [Citation.]  The Court recognized that a sentencer might encounter the rare juvenile offender who exhibits such irretrievable depravity that rehabilitation is impossible and life without parole is justified.  But in light of 'children's diminished culpability and heightened capacity for change,' *Miller* made clear that 'appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon.' [Citation.]

> "*Miller*, then, did more than require a sentencer to consider a juvenile offender's youth before imposing life without parole; it established that the penological justifications for life without parole collapse in light of 'the distinctive attributes of youth.' [Citation.]  Even if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects ' "unfortunate yet transient immaturity." ' [Citations.]  Because *Miller* determined that sentencing a child to life without parole is excessive for all but ' "the rare juvenile offender whose crime reflects irreparable corruption," ' [citations] it rendered life without parole an unconstitutional penalty for 'a class of defendants because of their status'—that is, juvenile offenders whose crimes reflect the transient immaturity of youth. [Citation.]  As a result, *Miller* announced a substantive rule of constitutional law.  Like other substantive rules, *Miller* is retroactive because it ' "necessarily carr[ies] a significant risk that a defendant" '— here, the vast majority of juvenile offenders—" 'faces a punishment that the law cannot impose upon him.' " [Citations.]" (*Montgomery*, *supra*, 577 U.S. at pp. ___–___ [136 S.Ct. at pp. 733–734].)

Defendant reasons:  "Proposition 57 helps to effectuate the substantive rule of constitutional law established by *Miller*, by creating a presumption that juvenile offenders be treated within the juvenile system with its focus on rehabilitation rather than punishment.  The requirement of a juvenile transfer hearing which considers the juvenile's amenability to rehabilitation is necessary to effectuate the *Miller* mandate that juvenile LWOP be rare.  Thus, under *Montgomery*, Proposition 57 requiring a juvenile transfer hearing must be retroactively applied to juvenile offenders sentenced to LWOP.

77.

Because [defendant] was sentenced to LWOP, the Eighth Amendment requires that she be accorded a juvenile transfer hearing to enable evaluation of her amenability to rehabilitation."

In our view, neither *Miller* nor *Montgomery* suggests a juvenile offender is constitutionally entitled to an opportunity to be adjudicated in the juvenile court system. Our state Supreme Court has concluded there is no such constitutional right (*Manduley*, *supra*, 27 Cal.4th at pp. 564–565), and nothing in the United States Supreme Court's more recent pronouncements causes us to doubt that conclusion.

Here, the trial court clearly had in mind that the overriding question at sentencing was whether, in light of all the *Miller* factors and those to be considered under Penal Code section 190.3 and the California Rules of Court, defendant was the rare juvenile offender whose crime reflected irreparable corruption resulting in permanent incorrigibility, rather than transient immaturity. Thus, the trial court fully evaluated defendant's amenability to rehabilitation, simply not in the context of a fitness/transfer hearing. The trial court expressly found defendant could not be rehabilitated and that LWOP was the appropriate sentence. Neither *Miller* nor *Montgomery* entitles defendant to anything more.

## DISPOSITION

The judgment is affirmed.

_____
HILL, P.J.

WE CONCUR:


_____
POOCHIGIAN, J.


_____
MEEHAN, J.

78.